**In re SUNFLOWER RACING, INC.
d/b/a The Woodlands, Debtor.**

**Bankruptcy No. 96–21187–11–JTF.**

United States Bankruptcy
Court, D. Kansas.

April 8, 1998.

F. Stannard Lentz, John J. Cruciani, Lentz & Clark, P.A., Overland Park, KS, R. Scott Beeler, Lathrop & Gage, L.C., Overland Park, KS, for Debtor.

Jan Hamilton, Leon B. Graves, Hamilton, Peterson & Keeshan, Topeka, KS, for Hollywood Park, Inc.

Mark A. Shaiken, David L. Zeiler, Stinson, Mag & Fizzell, P.C., Kansas City, MS, for Creditor Group, Collectively.

Laurence M. Frazen, Bryan Cave, L.L.P., Kansas City, MS, for Bank Midwest, N.A.

S. Todd Barton, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, TX, for FCL Loans, L.P.

Thomas M. Franklin, McQuain, Block, Dehardt & Rosenbloom, P.C., Kansas City, MS, for Mid–Continent Racing and Gaming Company I, II and III.

## MEMORANDUM OPINION

JOHN T. FLANNAGAN, Bankruptcy Judge.

Sunflower Racing, Inc.'s May 1996 bankruptcy has prevented creditors from foreclosing on The Woodlands race track while Sunflower lobbied for slot machines to boost the track's revenues. Having failed in this effort, Sunflower now plans to sell the track to

an Indian Tribe after two more years if governments would permit. To make the sale, Sunflower must clear the creditors' lien from the property by substituting for it a letter of credit. And it must deny the creditors the right to bid at the sale to prevent them from purchasing the property. Can this plan be forced on the dissenting creditors under the Bankruptcy Code's confirmation standards?

The answer is no. The plan fails to satisfy the fair and equitable standards of § 1129(b); it fails to repay secured claims with a market rate of interest; it fails to meet the feasibility requirement of § 1129(a)(10); it fails to comply with the absolute priority rule or its new value corollary; it fails to disclose fully the identity and affiliations of plan participants; and it fails to show that fees due the United States Trustee have been or will be paid.

### The Fair and Equitable Standards

Three standards for measuring whether a plan of reorganization is fair and equitable to a dissenting class of secured claimants appear in Bankruptcy Code § 1129(b)(2)(A). These three standards, expressed in subparagraphs (i), (ii), and (iii) below, supply the rules for judging Sunflower's plan. The first of these standards will be discussed in the section dealing with the claims of Class 1. The other two standards will be discussed in separate sections of the opinion.

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class *includes* the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.[1]

### Background

■ Sunflower Racing filed this Chapter 11 case on May 17, 1996, to reorganize its principal asset, The Woodlands, a dog and horse racing track. The secured creditor class, having elected § 1111(b)(2) treatment, voted against the plan and Sunflower requested cram down. *Cram down* is a colloquial expression used in bankruptcy practice to signify confirmation of a reorganization plan notwithstanding the negative vote of a secured creditor class—the court figuratively crams the plan down the throat of the dissenting class.

The Court held a four-day contested confirmation hearing beginning on January 22, 1998. The *dramatis personae* are:

### Sunflower Racing, Inc.

Sunflower Racing evolved from the efforts of R.D. Hubbard and Richard J. Boushka to promote dog and horse racing in Kansas. They formed the corporation to own and operate The Woodlands. Mr. Hubbard

---

1. 11 U.S.C. § 1129(b) (emphasis added).

owned 60 percent of Sunflower's stock and Mr. Boushka owned 40 percent.

The Woodlands opened as a newly constructed racing facility in 1989 on 386 acres in western Wyandotte County, Kansas. The facility is approximately 15 miles from the center of Kansas City, Kansas, just across the river from metropolitan Kansas City, Missouri. Sunflower represents The Woodlands to be unique. Apparently, it is the only racing complex in the United States featuring dual tracks—a dog racing track and grandstand adjacent to a horse racing track and grandstand.

Bruce G. Rimbo is Sunflower's president and chief executive officer. F. Stannard Lentz and John J. Cruciani of Lentz & Clark, P.A., Overland Park, Kansas, and R. Scott Beeler of Lathrop & Gage, L.C., Overland Park, Kansas, represent Sunflower in this case.

**Hollywood Park, Inc.**

Hollywood Park is an Inglewood, California, corporation interested in various gambling enterprises in the United States. Hollywood's stock is publicly traded over the counter and reported among the WALL STREET JOURNAL'S NASDAQ Small–Cap Issues. R.D. Hubbard is chairman of the board of directors of Hollywood Park.

In March 1994, R.D. Hubbard and Richard J. Boushka exchanged all of their stock in Sunflower Racing for stock in Hollywood Park. This exchange made Sunflower the wholly-owned subsidiary of Hollywood Park.

Jan Hamilton and Leon B. Graves of Hamilton, Peterson & Keeshan, Topeka, Kansas, represent Hollywood Park. But Hollywood Park is not a debtor in this bankruptcy case.

**TRAK East**

TRAK East stands for The Racing Association of Kansas East, a Kansas not-for-profit corporation. It qualifies as a charitable organization under § 503(b) of the, Internal Revenue Code. TRAK East was organized to hold a racing "organization license" under Kansas racing statutes.[2]

Kansas passed the Pari–Mutuel Racing Act in 1988. Under this law, only *bona fide* non-profit organizations meeting the requirements of § 503(b) of the Internal Revenue Code can receive an organization license.[3] Any entity that has contracted to manage a racing facility for the holder of an organization license may receive a "facility owner and manager license." This license authorizes the managing party to construct and own a dog or horse racing track. The Act created the Kansas Racing and Gaming Commission to administer licensing of dog and horse racing facilities.[4]

The Kansas Racing and Gaming Commission granted TRAK East an organization license for pari-mutuel betting in 1988. Sunflower contracted with TRAK East to manage and operate a racing facility on TRAK East's behalf. This qualified Sunflower for a "facility owner and manager license." Accordingly, later that year, the Commission granted Sunflower a license to build, own and operate The Woodlands.

Dale L. Somers of Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., Topeka, Kansas, appeared for the Kansas Racing and Gaming Commission as an observer, but did not otherwise participate in the hearing.

**The Bank or Creditor Group**

Sunflower financed construction of The Woodlands through a five-member Bank Group that participated in lending it approximately $40 million. The Bank Group took as collateral a mortgage and security agreement, a construction loan agreement, and other documents dated October 11, 1988. These documents granted the Bank Group members mortgages of equal rank.

When R.D. Hubbard exchanged his Sunflower stock for Hollywood Park stock in 1994, he executed a formal subordination agreement relating to an unsecured claim he held against Sunflower. The agreement subordinated Hubbard's claim to the Bank Group's mortgage on The Woodlands. And it assigned to the Bank Group Hubbard's

---

2. The Kansas statute uses the noun "organization" as an adjective to describe the license.

3. K.S.A. 74–8813a.

4. K.S.A. 74–8801 et seq.

right to vote his subordinated claim in any Chapter 11 reorganization case Sunflower might file, such as this one.

At the same time, Hollywood Park and the Bank Group agreed to amend the original financing documents covering The Woodlands. Hollywood Park executed a formal pledge agreement, pledging its newly acquired stock in Sunflower to the Bank Group. Apparently, Sunflower consented to the amendment.

When Sunflower filed its bankruptcy petition, the Bank Group consisted of: (1) First Union National Bank of Florida, (2) Bank One Lexington, N.A., (3) Bank Midwest, N.A., (4) INTRUST Bank, N.A., and (5) FCLT Loans, L.P. Since the bankruptcy filing, First Union Bank of Florida, Bank One Lexington, N.A., and INTRUST Bank, N.A., have sold their claims to companies controlled by William M. Grace. These sales account for the mortgage holders now being called the "Creditor Group," rather than the Bank Group. The Creditor Group's combined claim is now valued at $29,811,873.32.

Mark A. Shaiken and David L. Zeiler of Stinson, Mag & Fizzell, P.C., Kansas City, Missouri, represent the Creditor Group, collectively.

Laurence M. Frazen of Bryan Cave, L.L.P., Kansas City, Missouri, represents Bank Midwest, N.A., and S. Todd Barton of Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, Texas, represents FCLT Loans, L.P.

### William M. Grace

William M. Grace is a gaming entrepreneur with an interest in a riverboat casino in St. Joseph, Missouri. He also has business ties to the Iowa Tribe of Kansas, which operates a casino on its reservation at White Cloud, Kansas, in the northeastern corner of Kansas.

As mentioned, Mr. Grace purchased three claims from members of the Bank Group after Sunflower filed this case. To hold the purchased claims, he formed three Kansas corporations. Ultimately, those corporations were named Mid–Continent Racing and Gaming Company I, Mid–Continent Racing and Gaming Company II, and Mid–Continent Racing and Gaming Company III.[5] Gaming I holds the claim of INTRUST Bank, N.A. Gaming II holds the claim of First Union National Bank of Florida.[6] Gaming III holds the claim of Bank One Kentucky, N.A., formerly Bank One Lexington, N.A. The Creditor Group, Class 1 in the plan, now consists of: (1) Bank Midwest, N.A., (2) FCLT Loans, L.P., (3) Gaming I, (4) Gaming II, and (5) Gaming III.

Thomas M. Franklin of McQuain, Block, DeHardt & Rosenbloom, P.C., Kansas City, Missouri, represents the three Gaming entities that Mr. Grace controls.

### Wyandotte Tribe of Oklahoma

The Wyandotte Tribe of Oklahoma is the linchpin of Sunflower's plan. This federally-recognized Indian tribe occupies a 200–acre reservation in Wyandotte, Oklahoma. Wyandotte, Oklahoma, is approximately 90 miles northeast of Tulsa. The Tribe's financial resources are meager. It derives its primary income from small farms and a convenience store on the reservation. Since the Wyandotte reservation is located near a number of other tribal reservations conducting gaming without great success, reservation gaming is unattractive to the Wyandotte Tribe.

Consequently, Chief Leaford Bearskin, the Tribe's leader, and his council have turned to the prospect of off-reservation Indian gaming as a possible solution for their economic problems. Initially, the Tribe's off-reservation casino plans focused on land contiguous to the Tribe's sacred burial grounds located in the central business district of Kansas City, Kansas. The sacred burial grounds are known as the Huron Cemetery. This cemetery is the vestige of tribal lands the Wyan-

---

5. Initially, the corporate names were Woodlands Racing and Gaming Company I, Woodlands Racing and Gaming Company II, and Woodlands Racing and Gaming Company III. In response to a copyright dispute with Sunflower, Grace changed the corporate names to Mid–Continent Racing and Gaming Company I, II, and III.

6. Grace acquired the claim of First Union National Bank of Florida in his individual name and thereafter transferred it to Gaming II.

dottes once occupied in what is now Wyandotte County, Kansas. The Tribe moved from this land to Oklahoma in 1855, but retained its sacred burial grounds. The Secretary of Interior has held the cemetery in trust for the Tribe since the Wyandotte Treaty of January 1, 1855.[7]

Adjoining the cemetery is a half acre of land referred to as the Shriner property. This name stems from the property's history as the site of a Masonic ·Temple. Chief Bearskin has recently succeeded in having the Secretary of Interior take the Shriner property into trust for the Tribe. However, the Kansas Governor, the Absentee Wyandottes,[8] and the other Kansas Indian tribes are presently contesting that action in two consolidated law suits before the Honorable Richard Rogers, United States District Judge, Topeka, Kansas. If the Wyandotte Tribe successfully defends this suit, the Shriner property will apparently be eligible for Indian gaming. But, as might be expected, the City of Kansas City, Kansas, opposes a gambling casino in its central business district. To deflect this prospect, the City has encouraged the Tribe to abandon its downtown casino plans in favor of a casino at The Woodlands. This idea appeals to the Tribe, to Sunflower, and to Hollywood Park. Accordingly, they have jointly constructed the elaborate plan for Indian gaming at The Woodlands now before the Court.

To protect its national sovereignty, the Wyandotte Tribe of Oklahoma often conducts its business through a tribal corporation organized under the laws of the United States.

**Huron Gaming, L.P.**

Huron Gaming, L.P., a Delaware limited partnership, is mentioned in the plan as having a role in the financing, construction, and operation of a casino at The Woodlands,

should Sunflower's plan ever come to fruition. H.P. Kansas, Inc., a Delaware corporation, and NORAM, North American Sports Management, Inc., a Florida corporation, are the general partners of Huron Gaming, L.P. Hollywood Park, Inc., a Delaware corporation, and NORAM are limited partners of Huron Gaming, L.P. NORAM has a consulting agreement with the Wyandotte Tribe of Oklahoma to assist the Tribe in obtaining, designing, and developing a casino at The Woodlands.

### The Competition

Before The Woodlands' opening in 1989, the accounting firms of Arthur Andersen and Coopers and Lybrand had projected its earnings. In March 1991, the Institute for Public Policy and Business Research at the University of Kansas reported that through its first 18 months of operation, The Woodlands had exceeded those earlier projections.[9]

But the seeds of competition that would threaten The Woodlands' early success were already growing. In 1988, the United States Congress passed the Indian Gaming Regulatory Act ("IGRA"), leading eventually to widespread casino-style gambling throughout the country and particularly throughout the Midwest.[10]

The sudden explosion of Indian gaming and a weak economy in the early 1990s caused states to look for additional revenue from other forms of gambling. In October 1992, for example, the Kansas Lottery implemented Club Keno, a lottery game conducted every five minutes for approximately 17 hours per day all over the state. Club Keno increased the Lottery's revenues by more than $30 million and had an instant negative

---

7. 10 Stat. 1159 (1855). " 'Trust land' or 'land in trust status' means land the title to which is held in trust by the United States for an individual Indian or a tribe." 25 C.F.R. § 151.2(d).

8. The Absentee Wyandottes are the descendants of those members of the Wyandotte Tribe who chose not to move with the Tribe to Oklahoma in 1855.

9. *See* Second Amended Disclosure Statement to Debtor's Second Amended Plan of Reorganiza-

tion filed October 31, 1997, Part II.C., History and Background of the Debtor, Debtor's Initial Success, at 5–6.

10. *See* Second Amended Disclosure Statement to Debtor's Second Amended Plan of Reorganization filed October 31, 1997, Part II.D., History and Background of the Debtor, The Advent of Competition and Events Leading to Chapter 11 Bankruptcy Filing, at 6–9.

impact on the revenues of pari-mutuel racing at The Woodlands.[11]

Early in 1994, the Kansas Supreme Court held that Kansas voters had cleared the way for state-operated Indian casinos when they approved the state-owned and operated lottery. The Kansas Legislature eventually approved compacts with the four Indian tribes in Kansas, all of whom have since opened casinos. The Kickapoo Tribe opened the Golden Eagle Casino in July 1996 on tribal ground an hour's drive north of Topeka, Kansas. The Prairie Band of the Pottawatomie opened a facility with slot machines in October 1996 in Mayetta, Kansas. The Sac and Fox Tribe opened a full gaming facility in February 1997, 15 miles north of Holton, Kansas. And the Iowa Tribe of Kansas recently opened a casino at White Cloud in the far northeastern corner of the state.

Riverboat gambling has been another result of the search for state revenues. In 1991, Iowa became the first state to permit privately-owned riverboat casino gaming. To the detriment of The Woodlands, Missouri soon followed suit. In June 1994, the first riverboat in Kansas City, Missouri, opened at Riverside, within 15 miles of The Woodlands. It offered games of skill, including video poker. Harrah's opened its first riverboat in September 1994. After some political and legal wrangling, the Argosy and Harrah's were allowed to add slot machines in December 1994. Then, Harrah's added another riverboat to its complex. Other riverboats soon followed: Sam's Town, the Hilton Flamingo, and Station Casino with its two-boat complex. Finally, the Frontier Casino in St. Joseph, Missouri, opened approximately 40 miles from The Woodlands. This left The Woodlands with more riverboat competition within a 40–mile radius than any other race track in America.[12]

### Sunflower's Lobbying

Sunflower officials decided in 1993 that to be competitive, The Woodlands must incorporate casino-style gaming with pari-mutuel racing. That year Sunflower sought a consti-

tutional amendment in Kansas to allow privately-owned casinos at pari-mutuel tracks. The Kansas Senate approved the resolution by the required two-thirds majority vote, but the amendment failed in the Kansas House of Representatives when it was carried over to the 1994 legislative session.[13]

Also in 1994, Sunflower began working with the four Kansas Indian tribes to form a partnership to construct a large casino at The Woodlands, but that effort was eventually discontinued.

In 1995, Sunflower worked with other pari-mutuel tracks in the state to amend the Kansas Lottery Act to permit placement of Lottery-owned slot machines at pari-mutuel tracks. The House of Representatives passed the measure, but a Senate committee blocked the bill. A similar amendment was offered to another bill on the Senate floor, but it failed by two votes.

In 1996, Sunflower again attempted to win approval for slot machines under the Kansas Lottery Act. Kansas Governor Bill Graves proposed in his State of the State address a constitutional amendment allowing slot machines at various locations, including pari-mutuel tracks. This proposal failed for lack of support, however.

Eventually, Sunflower pushed a bill permitting lottery-style games, but not slot machines, at the track. The Senate passed this bill by a 26 to 14 vote, but a Kansas House committee stymied the bill.[14]

### Bankruptcy Filing

Given the environment of strong competition, Sunflower concluded in 1996 that it could no longer meet its overhead expenses and debt service for The Woodlands. It filed this Chapter 11 bankruptcy on May 17, 1996.

Hoping to bolster The Woodlands' revenues, the Creditor Group agreed to a cash collateral order allowing Sunflower to lobby once again for slot machines. The order fixed June 1, 1997, as the deadline for accomplishing this task. When June 1 came without slot machines, Sunflower proffered the

---

**11.** *Id.*

**12.** *Id.*

**13.** *Id.*

**14.** *Id.*

current plan—the sale of The Woodlands to the Wyandotte Tribe of Oklahoma. Notwithstanding the June 1 drop-dead provision and a Creditor Group motion for stay relief, Sunflower was allowed to refine its plan.

## Valuation

The testimony reflects two values for The Woodlands. J. Russell Dillon, Sunflower's appraiser, valued the property at $7,545,000. He had submitted his appraisal report earlier in the case and had testified to that same number at a stay relief hearing. At the confirmation hearing, Dillon testified that the $7.5 million value had not changed. His appraisal report, which is attached as Exhibit B to Sunflower's Second Amended Disclosure Statement filed October 31, 1997, includes information regarding, among other things, the Kansas pari-mutuel industry, a description of the debtor and the property, and the basis for his appraised value of The Woodlands.

Gerald R. Maier, the Creditor Group's appraiser, testified that the value of The Woodlands is $18,230,000. He based his opinion on some of Dillon's data, but came to a higher number by considering the sale price of another Kansas race track that Dillon did not consider. For purposes of this decision, the valuation range of $7,545,000 to $18,230,000 for The Woodlands will suffice. The Court does not need to fix the property's exact value.

## Classification of Claims

Sunflower's plan is based on two time periods. The first period extends for 24 months from the "Effective Date" of the plan to December 31, 1999, the "Implementation Date." [15] The second period begins on the Implementation Date and extends for 84 months, a period of seven years. The combined periods total 108 months or 9 years. The plan creates five classes of claims and one class of interests. It treats the classes differently during the two time periods.

## Class 1 Claims (Allowed Secured Claim of Creditor Group)

Class 1 contains the allowed secured claims of the five-member Creditor Group:

| | |
|---|---|
| Bank Midwest, N.A. | $ 744,441.28 |
| FCLT Loans, L.P. | 3,722,206.40 |
| Gaming I | 1,488,882.56 |
| Gaming II | 20,099,914.57 |
| Gaming III | 3,722,206.40[16] |

The plan would pay Class 1 $2.5 million on the Effective Date and thereafter $508,205.04 over the first 24 months at $21,175.21 per month. Accordingly, the plan would pay Class 1 a total of $3,008,205.04 during the first 24 months. If The Woodlands were taken into trust by the twenty-fourth month, the class would become the beneficiary of a letter of credit for the amount of its allowed claim less the payments made during the first 24-month period. For example, if all the proposed payments were made during the first period and The Woodlands were taken into trust on December 31, 1999, the amount of the letter of credit would be $26,803,668.28 ($29,811,873.32 less $2,500,000.00 less $508,205.04). Beginning in the twenty-fifth month, the plan would pay this class according to the following schedule of increasing payments:

| Payments | Amount of Monthly Payment | Total Payments |
|---|---|---|
| Month 25–36 (month 1) | $ 50,000.00 | $ 600,000.00 |
| Month 37–48 | $100,000.00 | $1,200,000.00 |
| Month 49–60 | $208,333.33 | $2,500,000.00 |
| Month 61–72 | $333,333.33 | $4,000,000.00 |
| Month 73–84 | $416,666.67 | $5,000,000.00 |
| Month 85–96 | $500,000.00 | $6,000,000.00 |
| Month 97–108 (month 84) | $667,656.11 | $8,011,873.32 [17] |

15. December 31, 1999, is now only 21 months away, but the plan language used 24 months, so to avoid confusion, the Court will stay with that number.

16. These numbers, taken from the proofs of claims filed by these creditors on July 11, 1997, total $29,777,651.21. When Sunflower filed its plan, it calculated the Creditor Group's total claim, including interest as of that time, at $29,811,873.32.

17. This schedule of payments is taken from Debtor's Second Amended Plan of Reorganization filed October 31, 1997, § 4.2.2 at 13. The total

But the plan would deduct from these payments the monthly payments Sunflower would make in the initial 24 months after the Effective Date. Those payments total $508,205.24. The deductions would conform to the following schedule: $100,000.00 in Months 25–36; $100,000.00 in Months 37–48; $100,000.00 in Months 49–60; $100,000.00 in Months 61–72; and $108,205.24 in Months 73–84.[18] Of course, these deductions affect the present value of the proposed stream of payments.

Class 1 has unanimously elected § 1111(b)(2) treatment; therefore, it holds an allowed claim of $29,811,873.32 secured by a lien on The Woodlands for the full amount of the allowed claim. This means, of course, that if Sunflower's plan were confirmed but subsequently failed, Class 1 would be entitled to any appreciation in the value of The Woodlands. Class 1 voted to reject the plan.

■ Section 1129(b)(2) permits the Court to cram down a plan on a dissenting secured class, such as Class 1, if the plan is fair and equitable. The statute establishes three standards for determining when a plan is "fair and equitable." The first standard, expressed in § 1129(b)(2)(A)(i), permits deferred cash payments.[19] Under this standard, the plan must provide that the holders of claims within the class retain their liens and receive on account of their claims deferred cash payments totaling at least the allowed amount of the claims. And those payments must have a present value, as of the effective date of the plan, of at least the value of the claim holder's interest in the estate's interest in the property. The holder's interest in the estate's interest in the property is merely the value of the property.

Class 1's interest in the estate's interest in the property is set out in the plan at $6,019,-425.46. Sunflower computes this value for its interest by deducting Wyandotte County's tax lien of $1,992,886.82 from the $7,545,000.00 valuation of Mr. Dillon and adding $467,312.28 for the value of personal property not included in his valuation. Deducting the $1,992,886.82 tax hen from Mr. Maier's $18,230,000 value for The Woodlands, the Creditor Group would calculate its interest in the estate's interest at $16,237,113.18.

Using the contract rate of interest of 7.22 percent compounded monthly,[20] Sunflower's present value analysis calculates the present value of all payments proposed for Class 1 under the § 1111(b)(2) election. The present value analysis, attached as Exhibit I to the Second Amended Disclosure Statement filed October 31, 1997, shows the present value of all payments to Class 1 is $19,514,667.42, and the deferred payments total $29,811,873.32.[21]

Under either valuation scenario ($6,019,425.46 or $16,237,113.18), the present value of the payments exceeds the value of the claim holders' interest in the estate's interest in The Woodlands. And the total of the deferred payments comports with § 1129(b)(2)(A)(i) by totaling the amount of the allowed claim of $29,811,873.32. But these mathematical calculations only appear to satisfy § 1129(b)(2)(A)(i). They do not, however, because they are based on a 7.22 percent discount rate, a rate described by the plan as the contract rate.

Whether the plan actually uses the contract rate is the subject of some confusion. The present value analysis was prepared using the contract rate of interest of 7.22 percent compounded monthly.[22] But the testimony pointed out that the contract compounded interest quarterly, not monthly. And the contract used the LIBOR (London Interbank Offered Rate) rate plus 1.75 per-

---

payments column has been rounded to the nearest dollar.

18. Debtor's Second Amended Plan of Reorganization filed October 31, 1997, § 4.2.3 at 14.

19. *See supra* p. 2, text of statute.

20. Debtor's Second Amended Plan of Reorganization filed October 31, 1997, § 4.2.2, at 13–14.

21. The Court's own calculations with the same discount rate results in a present value of $19,397,956.37 and total payments of $29,811,873.32.

22. Exhibit I attached to Second Amended Disclosure Statement to Debtor's Second Amended Plan of Reorganization filed October 31, 1997.

cent. The evidence showed that on the date of the confirmation hearing, the LIBOR rate was 5.61 percent. Adding 1.75 percent to the 5.61 percent LIBOR market rate effective on the date of trial results in a rate of 7.36 percent. This rate is 14 basis points higher than the 7.22 percent proposed for use in debtor's plan.

■ In any event, simply using the contract interest rate of 7.22 percent does not accord with the weight of authority. The courts have required a market rate of interest on loans with similar risk to that being forced on the secured creditors here.[23] Sunflower's plan does not propose a market rate and the evidence does not show that the contract rate corresponds with a market rate for a similar loan.

## Class 2 Claims (Allowed Secured Tax Claim)

Class 2 contains the allowed secured claim of the Treasurer of Wyandotte County, Kansas, in the amount of $1,992,886.82. This claim is a first lien on The Woodlands. The class is impaired and has voted to accept the plan.

The plan would pay this class $19,928.87 interest per month from the Effective Date to the Implementation Date calculated at 12 percent per annum as prescribed by Kansas Statute Annotated § 79–2004(d). On the Implementation Date, this class would receive $250,000.00 against its $1,992,886.82 claim, and Sunflower would sign and deliver a three-year promissory note to the class. The note would bear interest at 12 percent per annum, would commence monthly payments 30 days after the Implementation Date, and

would continue payments until the balance of the claim was paid in full. The Treasurer's lien on The Woodlands would be released on the Implementation Date and replaced by a letter of credit. Failure to deliver any payment within 30 days would be a default. Default would free the County to exercise its rights against the property or the letter of credit (depending on the timing of the default) without obtaining an order of the Bankruptcy Court.

The Creditor Group asserts that the vote of this class does not count under § 1129(a)(10). This statute denies confirmation unless at least one impaired class votes in favor of the plan.[24] The Group claims that Class 2 holds only a priority tax claim that is not entitled to vote. This is incorrect. Class 2 holds a lien on The Woodlands; therefore, it holds an allowed secured claim entitled to vote. The Creditor Group also claims that Class 2's vote cannot count because the class is unimpaired. But the plan clearly impairs Class 2 by deferring payment of the Treasurer's claim. Therefore, Class 2 is impaired, is entitled to vote, and has satisfied § 1129(a)(10) with its vote.

## Class 3 Claims (Allowed Unsecured Claims of the Creditor Group)

Class 3 contains the allowed unsecured claims of the Creditor Group, Class 1, but it is an empty set. Since Class 1 elected under § 1111(b)(2), it has no unsecured deficiency claim to be treated in Class 3. Thus, the election has eliminated Class 3.

## Class 4 Claims (Allowed Unsecured Claims of General Creditors)

Class 4 contains the allowed unsecured claims of general creditors totaling $18,323,-

---

**23.** *Hardzog v. Federal Land Bank (In re Hardzog),* 901 F.2d 858 (10th Cir.1990) (holding that in the absence of special circumstances, such as the market rate being higher than the contract rate, bankruptcy courts should use the current market rate of interest used for similar loans in the region); *Wade v. Bradford,* 39 F.3d 1126 (10th Cir.1994) (applying market rate of interest to creditor's claim in Chapter 11 case, rather than higher contract rate of interest, where bankruptcy court had found that no special circumstances existed to justify departure from prevailing market rate, and creditor failed to identify any such special circumstances on appeal); *In re Edgewater Motel, Inc.,* 85 B.R. 989 (Bankr.E.D.Tenn. 1988) (determining that reorganization plan

which proposed to pay impaired creditor 9 percent on deferred payments failed to meet best-interest-of-creditors test, and thus, could not be confirmed, where 12 percent represented current market rate of interest for comparable loans).

**24.**

(a) The court shall confirm a plan only if all of the following requirements are met: . . . .

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

476.51. It includes the following claims voting as indicated:

| | Accepted | Rejected |
|---|---|---|
| Richard Boushka | | $91,658.00 |
| R.D. Hubbard, voted by the Creditor Group | | $15,249,887.02 [25] |
| Shook, Hardy, & Bacon, L.L.P. | $30,988.82 | |

This class would receive a pro rata distribution of 10 percent to each claim holder no sooner than the thirtieth month after the Implementation Date and no later than the eighty-fourth month thereafter. Obviously, the class is impaired.

This class contains the subordinated claim of R.D. Hubbard. The Creditor Group voted Hubbard's claim against the plan. The Group claims the right to vote Hubbard's claim under assignment language in the subordination agreement he signed in 1994.

The Court need not decide whether the assignment justified the Creditor Group's vote of Hubbard's claim. Even without counting his vote, the class vote was sufficient to reject the plan. By statutory standards, Richard Boushka's dissenting vote of his $91,658.00 claim dominated the class. This class has rejected the plan. By not paying this class in full, the plan triggers the absolute priority rule because it also permits Class 6 to retain its stock interest in Sunflower.[26]

■ The plan would terminate R.D. Hubbard's subordination agreement as of the Effective Date. This attempt to terminate a third-party contract is beyond the power of Sunflower's plan.

### Class 5 Claims (Allowed Unsecured Claim of TRAK East)

Class 5 contains the allowed unsecured claim of TRAK East totaling $583,333.33. TRAK East holds the organization license for The Woodlands. The class is impaired and has voted to accept the plan.

The plan would cure any arrearages for unpaid charitable contributions or other obligations due TRAK East. From the Effective Date through the Implementation Date, TRAK East would receive $3,007.11 per

month. Each monthly payment would be credited against the obligation to TRAK East and no interest would accrue on its claim. On the Implementation Date, Sunflower would pay TRAK East $291,666.67. The balance of TRAK East's claim would be paid in full on or before the date 180 days after the Implementation Date.

■ The Creditor Group claims the vote of Class 5 cannot satisfy § 1129(a)(10) because TRAK East, the only class member, is an insider. The Group believes that TRAK East is an affiliate of Sunflower under § 101(2)(D), which defines *affiliate* as an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement." Likewise, § 101(31)(E) defines *insider* as an "affiliate, or insider of an affiliate as if such affiliate were the debtor." According to the testimony, TRAK East, which holds the organization license, has contracted with Sunflower for the latter's services in managing The Woodlands. Under this contract and the Kansas gaming laws, Sunflower operates The Woodlands as an owner and manager licensee. TRAK East is not the "entity that operates the business or substantially all of the property" of Sunflower under the operating agreement. Rather, Sunflower is that entity. Consequently, TRAK East does not fit the definition of an affiliate under § 101(2)(D) and is not an insider under § 101(31)(E).

Accordingly, Class 5's vote to accept the plan is proper and, along with Class 2's vote, satisfies § 1129(a)(10).

### Class 6 (Allowed Stock Interest of Hollywood Park, Inc.)

Class 6 contains the allowed interest of Hollywood Park, the holder of 100 percent of the stock of Sunflower Racing. Under the plan, Hollywood Park would retain its stock interest in Sunflower. Hollywood Park pledged this stock to the Creditor Group. The plan would terminate the pledge agreement on the Effective Date. This attempt to terminate a third-party contract is beyond the power of Sunflower's plan.

---

**25.** Hubbard's claim is an underwater secured claim classified here as unsecured.

**26.** § 1129(b)(2)(B).

This class is unimpaired because the plan does not alter its legal, equitable, and contractual rights. The class did not vote either to accept or reject the plan, however.

### Overview of the Plan

From the Effective Date of the plan to the Implementation Date, December 31, 1999, Sunflower and the Wyandotte Tribe of Oklahoma would work to have the Secretary of the Interior take The Woodlands into trust for the Tribe under the Indian Gaming Regulatory Act.[27] If this could be accomplished, the Tribe would purchase The Woodlands with a loan from Huron Gaming Co., an affiliate of Sunflower's. Among the many obstacles facing this plan is the Creditor Group's mortgage lien. This lien would have to be removed from The Woodlands before the Tribe could purchase it. To remove the lien, Huron Gaming Co. would deliver a letter of credit to the Creditor Group in the amount of its claim. This letter of credit would be substituted for the Creditor Group's collateral, and the mortgage lien would be released. The letter of credit would protect the Creditor Group during the seven years Sunflower would make deferred cash payments. If Sunflower were to default on the payments, the Creditor Group could draw on the letter of credit.

If the Tribe could get the Secretary to take The Woodlands into trust by the Implementation Date, the Tribe would then seek a compact with the Governor of Kansas permitting gaming at The Woodlands. The Kansas Legislature would also have to approve the compact.

If the approvals could be obtained, Huron Gaming would lend the Tribe the money to buy the property and Huron Gaming would construct a bingo hall and casino at The Woodlands. The Tribe would then give a seven-year master lease to Huron Gaming (or its unnamed affiliate) covering that part of the property encompassing the bingo hall and casino. Huron Gaming would sublease the casino to the tribal corporation. The tribal corporation would operate the casino.

And Huron Gaming would provide the Tribe with advice and assistance on equipping and furnishing the casino under a consulting agreement. This consulting agreement would also have to be approved by the National Gaming Commission, an agency with regulatory responsibility under IGRA. Under the sublease, the Tribe would receive rent of 70 percent of the available distributable cash and Huron Gaming would receive 30 percent. Under a contract with the Tribe, Sunflower would continue to operate the dog and horse races and pari-mutuel gaming at The Woodlands. Sunflower would pay creditors with gaming revenues according to the terms of the plan, and Hollywood Park would make up any shortfalls of cash necessary to make plan payments.

The details of this plan were presented in documents filling nine large three-ring binders offered by Sunflower. The Creditor Group introduced six similar binders containing numerous documents duplicative of those Sunflower submitted. Most of the testimony explained or contradicted how the various documents affected the plan. Amazingly, except for the option agreement and some letters, none of the documents were signed and none represented binding legal commitments by any of the third-party participants in the plan—the Wyandotte Tribe of Oklahoma, Huron Gaming, or Hollywood Park.

### Plan Sale

The discussion under Class 1 has considered the first standard for determining whether a plan is fair and equitable to a dissenting class of secured creditors. The second standard for judging what is fair and equitable appears in § 1129(b)(2)(A)(ii).[28] This standard declares fair and equitable the sale of encumbered property free and clear of liens if (1) the holder's liens attach to the proceeds of the sale, and (2) the liens on the proceeds are treated under one of the other two fair and equitable standards described in § 1129(b)(2)(A).

---

**27.** In addition to generally overseeing Indian affairs, the Secretary of the Interior regulates Indian gaming under the Indian Gaming Regulatory Act of 1988.

**28.** See supra p. 2, text of statute.

Sunflower's sale plan fails to follow § 1129(b)(2)(A)(ii), however. The plan proposes a sale free and clear of the Creditor Group's liens but bypasses having the liens attach to the sale proceeds. Instead, the plan substitutes a letter of credit for the liens directly. Furthermore, even though § 1129(b)(2)(A)(ii) is expressly subject to § 363(k), the plan disregards this Code section. Unless the court orders otherwise for cause, section 363(k) permits an allowed secured claim holder to bid its claim when its collateral is to be sold and to offset its claim against the purchase price of the property if it is the successful bidder. Sunflower makes no attempt to show cause why the plan should be allowed to withhold this § 363(k) right to bid.

When the Creditor Group first realized that the plan denied it the right to credit bid at the sale, it objected. It argued that the reference to § 363(k) in § 1129(b)(2)(A)(ii) entitled it to credit bid its claims. Considering this objection, the Court noted that another statute, § 1111(b)(1)(B)(ii), prohibits a class of recourse undersecured claims from electing § 1111(b)(2) treatment if the class holds an interest in property that is sold under a plan. Thus, it appears that because the plan proposes to sell the encumbered property, § 363(k) would permit the Creditor Group to bid at the proposed sale, and § 1111(b)(1)(B)(ii) would prohibit the Creditor Group from making the § 1111(b)(2) election.

Sunflower's plan provides the opposite. Its express terms prohibit the Creditor Group from bidding at the sale, but allow the Group to elect § 1111(b)(2) treatment. Can plan language preempt a right the Code gives? Can plan language grant an election the Code denies? This is precisely what Sunflower's plan attempts to do.

To support its plan, Sunflower offers *In re Waterways Barge Partnership*.[29] Like this case, *Waterways* involved a plan proposing a sale, but denying a recourse undersecured creditor the right to credit bid. Although the *Waterways* plan allowed that creditor to elect § 1111(b)(2) treatment, the creditor purposely chose not to make the election

because it believed that § 1111(b)(1)(B)(ii) prohibited it from doing so. Then the non-electing creditor objected to plan confirmation because it was denied the right to credit bid. Analyzing several cases involving plans that denied non-recourse creditors the right to credit bid, Bankruptcy Judge Houston concluded that an undersecured creditor, whether recourse or non-recourse, was entitled either to credit bid or to elect § 1111(b)(2) treatment. Since the plan in *Waterways* gave the objecting creditor the opportunity to elect § 1111(b)(2) treatment, even though the creditor knowingly chose not to, Judge Houston held that the creditor's objection lacked merit.

Following Judge Houston's lead, this Court overruled the Creditor Group's early objection since Sunflower's plan allowed the Creditor Group to make the § 1111(b)(2) election. This ruling permitted Sunflower to advance its plan. Now that the Creditor Group has elected § 1111(b)(2) treatment and the matter is before the Court for cram down, the question remains. Can a plan proposing a sale dispense with a recourse secured creditor's right to bid by granting in its place a right to elect § 1111(b)(2) treatment?

Section 363(k) appears to recognize and grant a real estate mortgage holder the same opportunity given by state law. Under state law, a mortgagee has the opportunity to control its collateral. It can bid at a foreclosure sale and credit its claim against the purchase price if it is the successful bidder. It can then become the owner of the property by obtaining a sheriffs deed. Once it owns the property, it can realize any benefit from the property's appreciation in value. In short, under state law, a mortgagee has an opportunity to own the property after foreclosure.

One way of looking at this plan's exchange of the right to bid for § 1111(b)(2) treatment is that the trade is even. That is, the plan preserves the mortgagee's right to credit bid in the form of the § 1111(b)(2) election. This is not far-fetched. The rationale for the election is to allow an undersecured creditor

---

**29.** *In re Waterways Barge Partnership,* 104 B.R. 776 (Bankr.N.D.Miss.1989).

to preserve its opportunity to realize any appreciation of the collateral by giving it a lien for the full amount of its claim. This is also what § 363(k) does. If the creditor is given the election in place of the right to bid, the election should be coextensive with the right to bid. · This means the election, like the right to bid, should preserve the creditor's opportunity to own the property. If so, then perhaps this opportunity should be preserved for the creditor unless the § 1111(b)(2) election substitutes the indubitable equivalent of the opportunity to own the property.[30] The Court need not make this reasoning a ground for decision in this case, however, since the plan fails on more fundamental grounds.

### Indubitable Equivalent

■ The third standard for determining whether a plan is fair and equitable to a dissenting secured class appears in § 1129(b)(2)(iii).[31] This is the indubitable equivalent standard. It allows the Court to find a plan fair and equitable if a class of secured claims can realize the indubitable equivalent of its claims. This plan's attempted substitution of a standby letter of credit for the Creditor Group's liens fails to satisfy this standard.

■ A letter of credit is a banking instrument. It is created when a bank's customer contracts with a bank to issue a letter of credit that a beneficiary can draw upon under specified circumstances. BLACK'S LAW DICTIONARY defines a *letter of credit* as: "An engagement by a bank or other person made at the request of a customer that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the letter of credit." BLACK'S defines a *standby letter of credit* as: "A letter of credit which commits the issuer to honor the credit not upon evidence of performance by the beneficiary, as by presenting evidence of the shipment of goods to the customer, but upon evidence or a mere decla-

ration of the customer's default in the underlying transaction with the beneficiary." [32]

Letters of credit are not generic. They may be revocable by the issuer, transferable by the beneficiary, and confirmable by another bank. And they may be general or special in designating a beneficiary and limited in their duration. No doubt some contain other qualifications as well.

Litigation to enforce letters of credit is not unheard of. No prudent lawyer would counsel his client to accept a letter of credit without knowing its specific terms. · If the Creditor Group had thoughts of accepting Sunflower's plan, it would have wanted answers to numerous questions before it voted to accept a letter of credit for its liens. Likewise, the Court would want those same answers before it could decide to· force a letter of credit on the Creditor Group.

If Sunflower had presented an actual letter of credit with its plan, the Creditor Group and the Court could have evaluated the letter's merits. The letter would have named the issuing bank so its financial stability could have been investigated. Since the plan payments run for nine years, the issuer's long-term financial prospects would be critical. The letter would have shown specifically who could draw on it. Could each creditor in Class 1 draw on it separately or could only one class representative draw on the letter and distribute the funds thereafter? The letter would have shown exactly what defaults would justify a draw and whether there could be any defaults other than nonpayment. The letter would also have shown how a draw would be accomplished—what documents would need to be presented to the issuer and what they would need to say. It would have indicated whether the credit would be unlimited in time. And if the Creditor Group were uneasy about the financial strength of the issuer, could a third-party bank be required to confirm the letter as an additional assurance that it would be paid?

---

**30.** Although generally the courts have refused to apply *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), in Chapter 11 cases when an undersecured creditor's claim is bifurcated under § 506, this may not be the case when the creditor elects § 1111(b)(2) treatment.

The result of this election mirrors the result of *Dewsnup.*

**31.** *See supra* p. 2, text of statute.

**32.** BLACK'S LAW DICTIONARY 903, 904 (6th ed.1990).

An actual letter of credit would have represented a legal commitment by the issuer. Hollywood Park called a bank officer to testify that Hollywood Park's credit qualified it for an immediate letter of credit sufficient to cover the Creditor Group's claim. But Hollywood Park has made no enforceable commitment to provide such a letter of credit now. What assurance would the Creditor Group have that the letter would be forthcoming, even if the other conditions of the plan were somehow miraculously met? Hollywood's capacity to obtain a letter of credit this year may not be the same in two years. Under some circumstances, an actual letter of credit might be an acceptable substitute for a lien, but this plan does not produce an actual letter of credit for examination and evaluation. Instead, it proposes a letter of credit in the future, almost two years in the future.

The plan has other problems relating to the substitution of a letter of credit for the Creditor Group's liens. It makes the Implementation Date the focal point for substituting a letter of credit for the Creditor Group's liens and the release of those liens. Referring to when the letter of credit will be provided, the plan says: "On the *Implementation Date*, the Reorganized Debtor shall substitute in lieu of the Creditor Group's existing collateral (i.e. the Property) a Letter of Credit in favor of the Creditor Group supporting the Reorganized Debtor's obligations pursuant to this paragraph...." [33] Referring to when the Creditor Group's liens will be released, it says: "The Order of Confirmation shall provide that any and all liens and/or encumbrances asserted by the Creditor Group against the Property shall be *released* on the *Implementation Date*." [34]

The plan defines *"Implementation Date"* to mean "the day when the Property is acquired by, and taken into trust by the United States Department of the Interior for the benefit of, [sic] the Tribe, which such date shall, in no event, be later than December 31, 1999." [35] Neither this definition nor any other statement in the plan, however, states precisely when the property will be considered to have been taken into trust. The use of the words "acquired by" implies that the property is not to be considered in trust until formal acceptance of the land under 25 C.F.R. § 151.14 by issuance or approval of an instrument of conveyance.

These plan provisions present a circuity problem. After referring to the Secretary's duty to notify an applicant of any liens, encumbrances, or infirmities that may exist concerning land to be taken into trust, 25 C.F.R. § 151.13 directs that "the Secretary may require the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition and *he shall require elimination* prior to such approval if the liens, encumbrances, or infirmities make title to the land unmarketable." [36] Obviously, the Creditor Group's mortgage liens on The Woodlands render it unmarketable for title purposes. Thus, the mortgage liens must be eliminated before the Secretary can approve taking the property into trust. Under the plan, the mortgage liens are not released until the land is in trust, but the land cannot be in trust until the liens are released. Likewise, the letter of credit remains unissued until the Implementation Date, but the Implementation Date cannot occur until the land has been conveyed into trust. And although the letter of credit should issue before the lien release, the plan is silent about this significant detail.

Of course, the plan could have solved these problems with appropriate provisions. The plan could have established a real estate closing date and included provisions like those in standard real estate contracts allowing time extensions and other agreements dealing with the inevitable contingencies and delays that attend most transactions. But this plan fails to provide those assurances. The Court should not force the Creditor Group into a transaction as imprecisely defined as this one is. The plan's ambiguous

---

33. Debtor's Second Amended Plan of Reorganization filed October 31, 1997, § 4.2.2, p. 12 (emphasis added).

34. *Id.* (emphasis added.)

35. *Id.* at 4.

36. 25 C.F.R. § 151.13 (emphasis added).

offer of a future letter of credit as the indubitable equivalent of the Creditor Group's liens is unfair and inequitable.

### Fair & Equitable

 The discussion has touched on the three standards for determining whether a cramdown plan is fair and equitable under § 1129(b)(2). Those three standards are not, however, the exclusive gauges of what is fair and equitable. Consulting the legislative history of § 1129(b)(2) and the definition of the word "includes" used in its text, the courts have concluded the statute sets only minimum standards for what is fair and equitable.[37]

Sunflower's present value analysis presents an example of this principle. The analysis shows that the total payments to Class 1, all those to be made during the nine years, have a present value of $19,514,667.42 as of the Effective Date, and total $29,811,873.32, the amount of the Creditor Group's allowed claim. This calculation appears to comply with the present value requirement of the Code, except for the fact that it is based on a non-market interest rate. While the analysis is mathematically correct, it is nevertheless flawed for confirmation purposes.

Using Sunflower's low valuation, the Creditor Group's allowed secured claim is $3,519,425.46 after deducting the initial $2.5 million payment. During the first 24–month payment period, the plan pays the Creditor Group interest of $21,175.21 per month, calculated at 7.22 percent per annum compounded monthly on the unpaid balance of the secured claim. But it pays no principal! If the payments to liquidate the $3,519,425.46 secured claim were amortized equally over the 108–month plan period, the first monthly payment of principal and interest would total $44,408.10. That payment would be composed of $23,232.89 of principal and $21,175.21 of interest. Obviously, while the plan pays interest, it does not pay principal during the first 24 month period.

 An undersecured creditor can not accrue interest on its secured claim during the time between filing of a Chapter 11 case and confirmation of a reorganization plan.[38] If the plan is confirmed, it must pay the allowed secured claim in cash as of the effective date or offer deferred cash payments. If deferred cash payments are proposed where the § 1111(b)(2) election applies, the Court cannot confirm the plan unless the payments total at least the allowed amount of the claim and have a present value, as of the effective date, of at least the amount of the claim holder's interest in the estate's interest in property. This present value idea means the claim must repay both principal and interest over time if it is to be judged fair and equitable. In the first period of this plan, however, the Creditor Group receives no repayment of principal. This result occurs because of the obvious back-end loaded payment schedule the plan proposes.[39]

 This back-end loaded payment schedule exemplifies negative amortization. *Negative amortization* has been defined as " 'a provision wherein part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue,' with the accrued interest added to the principal and paid when income is higher."[40] While this definition focuses on the nonpayment of interest, the principle applies as well to the nonpayment of principal. From the Creditor Group's perspective, the $21,175.21 payment labeled "interest" can be viewed as a principal payment while interest is being deferred. Either way, negative amortization results. And the payment of $21,175.21 of interest alone fails to meet the present value standard.

 Negative amortization plans are not barred per se. But they are viewed with suspicion. Courts judge them on whether

**37.** *Federal Savings & Loan Ins. Corp. v. D & F Const., Inc. (In re D & F Const., Inc.),* 865 F.2d 673, 675 (5th Cir.1989).

**38.** *United Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

**39.** *See supra* pp. 595–596.

**40.** *Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1176 (9th Cir.1992), citing *In re Club Associates,* 107 B.R. 385, 398 (Bankr. N.D.Ga.1989) (emphasis added).

they are fair and equitable by assessing the risk they place on the creditor who is not receiving principal and interest payments.[41] Under a negative amortization plan, such as this one, the present value analysis appears mathematically correct, but the plan's payout puts a greater risk on the creditor in the early payment periods.

With its present earnings alone, Sunflower does not have the ability to make the principal and interest payments over the first two-year proposed repayment period. Before it could make those payments, the property would have to be put into trust, and even then, without Hollywood's help, Sunflower could not afford the payments. At this time Hollywood Park's interests motivate it to assist with those payments. But this may not always be the case, and Hollywood is not legally committed to make the payments.

Hollywood Park is apparently unwilling to change places with the Creditor Group to attain the upside potential of The Woodlands. Although according to the testimony it has the current financial standing to obtain an actual $27 million letter of credit, it apparently lacks sufficient faith in the plan to obligate itself to that degree. In short, rather than assume the risk of default by obligating themselves under an actual letter of credit, Hollywood and Sunflower leave the Creditor Group with the risk of an unsuccessful effort to gain trust status during the two years before the Implementation Date.

█ If the plan were confirmed, the Creditor Group would not receive principal repayment on that part of the debt covering the $6,019,425.46 value of the Woodlands. The Creditor Group's right to credit bid under § 363 would be forfeited. The Creditor

Group would bear the major risk of the plan failing within its first two years. And the plan would rob the Creditor Group of the opportunity to pursue its own plans for restructuring The Woodlands, an opportunity state law would afford the Group. As stated by one court considering negative amortization: "A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.' "[42] Having considered the entire plan and the rights of the Creditor Group under state law and the particular fact and circumstance of the case, the Court concludes that this negative amortization plan is not fair and equitable to Class 1.

### Feasibility

█ Section 1129(a)(11) expresses what is commonly called the "feasibility test." Under this test, the Court cannot confirm a plan if it is "likely to be followed by the liquidation, or the need for further reorganization, of the debtor …".[43] The test applies even to a liquidating plan such as Sunflower's.

█ Too many uncertain events must occur before Sunflower's plan can be successful. The Secretary of Interior must place The Woodlands in trust for the Tribe by December 31, 1999. He will refuse to do so if the plan's consulting agreement is adjudged a management agreement. Or at least he will delay the process while the Tribe and Sunflower attempt to correct the deficiency. Before The Woodlands can be taken into trust, Huron Gaming (or Hollywood Park or some affiliate) must lend the Tribe the purchase price and the Creditor Group's liens on the property must be

41. *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725 (Bankr.E.D.N.Y.1994); *In re EFH Grove Tower Associates*, 105 B.R. 310 (Bankr.E.D.N.C.1989); and *In re Memphis Partners, L.P.*, 99 B.R. 385 (Bankr.M.D.Tenn.1989). *See also,* Honorable Barry S. Schermer & Keith W. Bartz, *Negative Amortization and Plan Confirmation: Is It Fair and Equitable Under Section 1129(b) of the Bankruptcy Code?*, 8 BANKR DEV.J. 1 (1991).

42. *Federal Savings & Loan Ins. Corp. v. D & F Const., Inc. (In re D & F Const., Inc.)*, 865 F.2d 673, 675 (5th Cir.1989), citing *In re Spanish Lake Associates*, 92 B.R. 875, 878 (Bankr.E.D.Mo.

1988); and *In re Edgewater Motel, Inc.*, 85 B.R. 989, 998 (Bankr.E.D.Tenn.1988).

43. (a) The court shall confirm a plan only if all of the following requirements are met:

....

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

cleared. This would require Hollywood Park to furnish the Creditor Group with a letter of credit in the amount of its claim at the time. If Hollywood or an affiliate can furnish the letter of credit, the liens can be released. If the land is taken into trust, the Kansas Governor must approve a gaming compact with the Tribe. And the Kansas Racing and Gaming Commission must approve the gaming procedures. Then the Kansas Legislature must approve the compact. Sunflower's lobbying history with the legislature casts doubt on the likelihood of this step. If all these steps are completed within the 21 months before December 31, 1999, all of the unsigned documents representing the agreements among Sunflower, Hollywood, the Tribe, and NORAM must be finalized and a casino constructed. Even then, the income of The Woodlands still depends on its competitive position among the other gambling attractions in the area.

Sunflower cannot pay for nine years as it proposes without the help of Hollywood Park and without incredible good luck leading to a completed series of events ending in Indian gaming at The Woodlands. Sunflower is unable to pay both principal and interest to the Creditor Group in the time before the Implementation Date.

The number of events that must occur even before the sale could be completed make the plan infeasible.

### New Value

■ Class 6 is composed of Hollywood Park, the 100 percent stockholder of Sunflower. The plan permits Class 6 to retain its stock while Class 4, higher in priority, is paid only 10 percent of its allowed claims. Hence, the absolute priority rule remains unsatisfied as to Class 4.

■ But Sunflower invokes the new value exception or corollary to the absolute priority rule. Those courts accepting the new value corollary look at four factors to decide whether the offered new value contribution should be permitted: the contribution (1) was necessary for reorganization, (2) was in money or money's worth, (3) was reasonably equivalent in value to the retained interest,

and (4) was substantial. Sunflower's plan satisfies the first two factors.

Sunflower claims that Hollywood's proposed contributions satisfy the remaining factors. Those contributions are the $2.5 million that Sunflower would use for the initial loan reduction and Hollywood's guarantee of the $508,205.04 of interest payments Sunflower would make during the first 24 months of the plan.

■ But the Court does not agree that Hollywood's contribution is reasonably equivalent to the value of the retained stock interest. This conclusion is based on two conservative assumptions—first, that the value of the contribution should be measured against the present value of The Woodlands rather that its potential value; second, that the present value of The Woodlands before deducting the $2.5 million up front principal reduction payment is, as the plan states, $6,019,425.46. Although substantial, Hollywood's contribution of $3,008,205.04 ($2,500,-000 plus $508,205.04) is not reasonably equivalent to this $6,019,425.46 value of The Woodlands.

### Disclosure of Identity

■ Section 6.8 of Sunflower's Second Amended Plan of Reorganization filed October 31, 1997, names the parties serving as officers of the reorganized debtor. But § 1129(a)(5) requires a more detailed disclosure. It calls for not only the identity of individuals, but also for their affiliations and a showing that the appointment or continuance in office of such individuals is consistent with the interests of creditors and equity security holders and with public policy.

■ Furthermore, the plan is silent concerning the affiliations of TRAK East. And although the testimony indicated that Bruce G. Rimbo had affiliations with Hollywood Park and, prospectively, with Huron Gaming, the plan fails to explain these relationships. Evidence at the confirmation hearing is no substitute for express statements on these subjects in the plan itself. A plan can be supplemented with evidence that clarifies its terms, but that evidence cannot be substituted for material the Code requires to be set

forth in the plan, such as that required by § 1129(a)(5).

## Payment of Fees

A similar plan defect relates to § 1129(a)(12).[44] Section 1129(a)(12) requires that fees under 28 U.S.C. § 1930 must have been paid by confirmation or that the plan provides they will be paid on the effective date of the plan. This plan does not address these fees.

Sunflower asked the Court to take judicial notice of its monthly reports to the United State Trustee, and the Court granted the request. Those reports have been furnished in two bound volumes. Paragraph 6 of each Monthly Report calls for a "Copy of Chapter 11 Quarterly Fee Payment Report (included for month during which fee is paid)," but with one exception, none are attached. The one attached form is entitled Chapter 11 Quarterly Disbursements and Fee Payments. It shows a $5,000.00 payment made on January 23, 1997. Although Sunflower's check register shows payments to the United States Trustee, the Court should not be required to scour those records for evidence the required payments have been made. The Court therefore finds that Sunflower has not proven that the fees have been paid and the plan does not provide for the payment of the fees on the effective date.

## Competitive Instincts

At an early status conference, the Creditor Group's counsel characterized the whole case as nothing but a fight between two gamblers, Hubbard and Grace. The evidence shows that like Sunflower and Hollywood Park, William Grace had his own aspiration of working out some co-operative arrangement with the Wyandotte Tribe of Oklahoma to salvage The Woodlands. The Grace-controlled Creditor Group's announcement that it would vote against Sunflower's plan reinforced this view of Grace's intentions.

Knowing that no consensual plan was in sight, on November 6, 1997, the Court set two dates. The first date, December 18, 1997, was established for reporting on the plan vote. The second date, January 22, 1998, was established to hear evidence in a cramdown hearing, which all parties and the Court anticipated.

From time to time, counsel for Sunflower and Hollywood Park have complained at status conferences about Mr. Grace's actions of buying claims. At one point, Sunflower's counsel forecast a challenge under § 1126(e) to the Creditor Group's vote against the plan. He apparently viewed Mr. Grace's claim purchases as having been made in bad faith. Neither Sunflower nor Hollywood Park formally complained, however, until January 13, 1998. On that date, they filed a joint motion to designate the Creditor Group's vote under § 1126(e) as cast in bad faith and a joint motion to modify a confidentiality order to reveal what Mr. Grace paid for the claims. The Court first saw these motions at a status hearing on Friday, January 16, 1998, shortly before trial. Trial was scheduled for the following Thursday, January 22, 1998. The Court advised counsel that it would review the motions and announce how he would handle them. At the beginning of the trial on January 22, the Court announced with respect to the joint motion to designate claims under § 1126(e) that "The Court does not need to rule on this motion until the evidence is in." [45] As to the joint motion to modify the confidentiality order the court stated: "The Court will rule on this motion if and when it becomes necessary during the trial." [46]

■ Nothing on these issues was presented at trial. So far as the evidence shows, Grace's only sin is purchasing claims at a discount. Purchasing claims at a discount is not bad faith. If Sunflower and Hollywood

---

**44.** (a) The court shall confirm a plan only if all of the following requirements are met:

. . . .

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

**45.** Transcript of Proceedings held on January 22, 1998, p. 8, lines 13–14.

**46.** Transcript of Proceedings held on January 22, 1998, p. 8, lines 17–19

Park had more damning evidence against Grace, they should have brought the designation issue before the Court earlier in the case or dealt with it at trial. The evidence is now in and it is too late to designate claims under § 1126(e).

Furthermore, even if all of the Gaming entities' claims were found to have been cast in bad faith, Class 1 would still have rejected the plan. The remaining claim holders, Bank Midwest, N.A., and FCLT Loans, L.P., voted to reject the plan.[47]

### Creditors' Plan

The Court denied the Creditor Group the right to have its plan put on the same track with Sunflower's plan. The Creditor Group appealed this order and the district court denied relief on the ground the order was interlocutory.[48] The decision in this case makes moot any further appeal of that question. The Creditor Group may now put forth its reorganization plan.

### Status Quo

The Kansas Racing and Gaming Commission has filed a motion expressing its concerns about the effect of shutting down The Woodlands. The Commission may request a conference with the Court to address those concerns. Meanwhile, The Woodlands will continue to operate pending confirmation of the Creditor Group's plan of reorganization or further order of the Court affecting continuation of the case.

### Conclusion

Confirmation of Sunflower's plan is denied for the reasons stated. Sunflower is hereby denied any opportunity to amend its plan or to request further proceedings toward its confirmation.

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a). A judgment reflecting this ruling will be entered on a separate document in compli-

ance with Fed.R.Bankr.P. 9021 and Fed. R.Civ.P. 58.

IT IS SO ORDERED.

---

47. Summary of Voting on Debtor's Second Amended Plan of Reorganization filed December 15, 1997.

48. *Mid–Continent Racing and Gaming Co. I v. Sunflower Racing, Inc. (In re Sunflower Racing, Inc.),* 218 B.R. 972 (D.Kan.1998).