## In re DOW CORNING CORPORATION, Debtor.

### Bankruptcy No. 95–20512.

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Dec. 1, 1999.

---

*AMENDED OPINION ON CRAMDOWN OF CLASS 4: IS IT FAIR AND EQUITABLE TO CRAM DOWN COMMERCIAL CLAIMS WITH INTEREST LESS THAN CONTRACT RATE?*

ARTHUR J. SPECTOR, Chief Judge.

The Debtor and the Official Committee of Tort Claimants negotiated and on November 9, 1998 filed a Joint Plan of Reorganization. The plan (hereafter referred to simply as the "Plan") was subsequently amended on February 4, 1999 and modified various times. The hearing on confirmation of the Plan commenced on June 28, 1999 and closing arguments were heard on July 30, 1999. Several post-hearing briefs and other submissions were received and the Court took the matter under advisement.

On this date the Court issued its Findings of Fact and Conclusions of Law on the matter of the confirmation of the Plan. This opinion is one of several which will serve to supplement and explicate some of the findings and conclusions. At least one opinion will follow later.

A general overview of the Plan's terms is contained in the opinion on classification and treatment issues. When necessary, additional Plan terms are explained here. Except when otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

Class 4, composed of commercial claims of various sorts, is impaired by the Plan, and did not accept it. Thus the Proponents' only option is to proceed via the so-called "cramdown" provision, which states that the Court "shall confirm the plan . . . if [it] . . . is fair and equitable[ ] with respect to" the dissenting class. 11 U.S.C. § 1129(b)(1).

A dispute has arisen over the rate at which interest on the Class 4 allowed claims should accrue for the time frame beginning with the commencement of this case and ending on the effective date of the Plan (hereafter, "pendency" interest). Under the terms of the Plan, this rate would be equal to the federal judgment rate in effect when the Debtor filed its petition. *See* 28 U.S.C. § 1961(a). The Official Committee of Unsecured Creditors and several of it constituents, who together we will call the "Commercial Creditors" (a

term defined in our previous opinion on interest rates, *In re Dow Corning Corp.*, 237 B.R. 380, 384 n. 1 (Bankr.E.D.Mich. 1999)), argue that this does not satisfy the "fair-and-equitable" requirement. They say that because the estate is solvent, pendency interest should be paid at the rate which would apply under the terms of their respective contracts with the Debtor.

By way of response, the Proponents assert that the contract rate of interest cannot properly be taken into consideration when assessing plan fairness. In section I below, we explain why that assertion is unpersuasive. In section II, we conclude that the provision calling for interest at the federal judgment rate is not fair and equitable.

## Discussion

### I.

The Proponents advanced several different arguments in support of their contention that we cannot invoke equity to require payment of interest at the contract rate. We address those arguments in the first four subsections which follow.

### A. Section 502(b)(2)

■ A "claim ... for unmatured interest" is disallowed. 11 U.S.C. § 502(b)(2). The Proponents assert that recognition of the contract rate would be contrary to § 502(b)(2), and therefore is not permissible. *See generally, e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). Before weighing the merits of that assertion, we will briefly review the historical developments leading up to the enactment of § 502(b)(2).

The Bankruptcy Code was enacted in 1978. It replaced, but is largely based on, the Bankruptcy Act of 1898, 11 U.S.C. § 1 *et seq.* (repealed). *See generally* 1 Collier on Bankruptcy, ¶ 1.01 (15th ed. rev.1999). Section 63 of the Act provided:

> Debts of the bankrupt may be proved and allowed against his estate which are (1) a fixed liability ... owing at the time of the filing of the petition against him ..., with any interest thereon which would have been recoverable at that date or with a rebate of interest upon such as were not then payable and did not bear interest; ... (5) founded upon provable debts reduced to judgments after the filing of the petition ..., less ... interests accrued after the filing of the petition and up to the time of the entry of such judgments....

11 U.S.C. § 103(a) (1898) (repealed).[1] The effect of § 63 was to "stop[ ], or at least suspend[ ], interest as of the date of filing the petition." *In re Norcor Mfg. Co.*, 36 F.Supp. 978, 979 (E.D.Wis.1941). *See also, e.g., In re Rhine*, 213 F.Supp. 527, 540 (D.Colo.1963) ("Section 63 ... provides for a cut off of interest after the filing of the petition and allows interest on other claims as accrued until th[at] date.").

The Supreme Court recognized that by virtue of § 63, the accrual of "interest on unsecured debts stops" with the filing of a bankruptcy petition. *Sexton v. Dreyfus*, 219 U.S. 339, 344, 31 S.Ct. 256, 55 L.Ed. 244 (1911). The parties claiming a right to postpetition interest in *Sexton* were secured creditors, and the Court was apparently of the view that § 63 was inapplicable under such circumstances (even though the creditors were undersecured and asserted a deficiency claim). *See id.* at 343–44, 31 S.Ct. 256. Instead of § 63, the Court turned to English bankruptcy law:

---

1. Section 1 of the Act provided that " '[a] person against whom a petition has been filed' shall include a person who has filed a voluntary petition." 11 U.S.C. § 1(1) (1878) (repealed). Thus § 63a(1) was never limited to involuntary petitions. *See* 3A *Collier on Bankruptcy*, ¶ 63.01[2.1] n. 12 (14th ed.1986) ("[T]he Act ... [as amended in] 1938 speaks of a petition filed *'by or* against' the bankrupt, whereas the Act of 1898 referred only to a petition 'against' the bankrupt.... In view of § 1(1) ..., this change is verbal only ....").

682

For more than a century and a half the theory of the English bankrupt system has been that everything stops at a certain date. Interest was not computed beyond the date of the commission.... This rule was applied to mortgages as well as to unsecured debts .... [T]he rule was laid down not because of the words of the statute, but as a fundamental principle. We take our bankruptcy system from England, and we naturally assume that the fundamental principles upon which it was administered were adopted by us when we copied the system, somewhat as the established construction of a law goes with the words where they are copied by another state....

*Id.* at 344, 31 S.Ct. 256. *See generally* C. Tabb, *Rethinking Preferences,* 43 S.C.L.Rev. 981, 996 (1992) ("Under English law a debtor became a bankrupt upon the *commission* of an act of bankruptcy, which predated (and indeed was the prerequisite to) the actual commencement of the bankruptcy proceeding and the appointment of the bankruptcy commissioners. The bankruptcy commissioners' title related back to the time of the act of bankruptcy...." (emphasis added)). Because English law made no exception to "the rule" against postpetition interest for the benefit of secured creditors, the Court inferred that the Act also countenanced no such exception. *See Sexton,* 219 U.S. at 344–46, 31 S.Ct. 256.

But *Sexton* did recognize an exception of a different kind, as it permitted "[i]nterest and dividends [that] accrued [postpetition] upon some of the securities" to be "appl[ied] ... to" post-petition interest. *Id.* at 346, 31 S.Ct. 256. *See United States v. Ron Pair Enters.,* 489 U.S. 235, 246, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (Although "[t]here was ... a pre-Code rule that the running of interest ceased when a bankruptcy petition was filed[,] ... pre-Code practice ... allowed dividends and interest earned by securities held by the creditor as collateral to be applied to post-

petition interest."). And by adverting to bankruptcy law as it had developed in England, *Sexton* laid the groundwork for another exception which would quickly come to be recognized by the courts.

In *Johnson v. Norris,* 190 F. 459 (5th Cir.1911), the Fifth Circuit was called upon to settle a dispute between creditors and the bankrupts over "the disposition of ... a surplus left in the hands of the trustees of the bankrupts after paying the principal of all claims proved and allowed, and the interest thereon up to the date of the filing of the petition in bankruptcy." *Id.* at 461. The creditors argued that they should be paid postpetition interest out of this surplus, while the bankrupts claimed that such interest was not recoverable under the Act. *See id.*

The court noted that the Act contained "no express provision ... allowing [postpetition] interest ... to be paid out of a surplus." *Id.* at 463. So taking its cue from *Sexton, id.* at 464, the court sought guidance from English precedent:

In 1743 ..., Lord Chancellor Hardwicke, in Bromley v. Goodere, 1 Atkyns, 75, considered and decided, under the English statutes, the exact question involved here.... The Lord Chancellor held that the creditors were entitled to have the [post-commission] ... interest paid out of the surplus. This rule was approved in later English cases....

Blackstone states the usual English rule to be that all interest on debts shall cease from the time of issuing the commission, yet, in cases of a surplus left after payment of every debt, such interest shall again revive.

*Id.* at 465.

The Fifth Circuit applied this "English rule," ordering that the surplus be used to pay creditors postpetition interest. *See id.* at 466. In keeping with *Sexton,* it justified this holding on the theory that Congress implicitly adopted the rule. *See id.* at 465–66. Alternatively, the Fifth Circuit reasoned that because the Act was silent on

the matter of postpetition interest, it was incumbent upon the court to resolve the issue based on "general principles of equity." *Id.* at 466.

The "solvency exception" recognized in *Norris* had previously been applied in non-statutory equity receivership proceedings.[2] *See American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266, 34 S.Ct. 502, 58 L.Ed. 949 (1914). And in *American Iron*, the Supreme Court cited *Norris* with apparent approval for the proposition that "[e]ven in bankruptcy, ... it has been held, in the rare instance where the assets ultimately proved sufficient for the purpose, that creditors were entitled to interest accruing after adjudication." *Id.* at 266–67, 34 S.Ct. 502 (dictum).

*American Iron's* implicit approval of *Norris* was later made explicit. In *City of New York v. Saper*, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949), the "ultimate issue ... [was] whether tax claims against a bankrupt bear interest until the date of bankruptcy ... or until payment." *Id.* at 329, 69 S.Ct. 554. The Court decided the issue against New York, citing *Sexton*, English law, and § 63. *See id.* at 330–41, 31 S.Ct. 256. In dictum, however, it essentially ratified the analysis in *Norris*:

> In England the [rule against postpetition interest] ... was well established.... Two exceptions were recognized: *if the alleged "bankrupt" proved solvent, creditors received post-bankruptcy interest before any surplus reverted to the debtor* ...; and if securities held by a creditor as collateral produced interest or dividends during bankruptcy such amounts were applied to post-bankruptcy interest .... *These exceptions have been carried over into our system.* [citation to *American Iron* and *Sexton* ] ....

*Id.* at 330 n. 7, 69 S.Ct. 554 (emphasis added). Thus while *Saper* was not a sol-

vent-debtor case, it clearly stands for the proposition that, § 63 notwithstanding, the court can require the bankrupt to pay postpetition interest if it has the means to do so. *See Ron Pair*, 489 U.S. at 246, 109 S.Ct. 1026 (citing *Saper* for the assertion that "pre-Code practice ... allowed post-petition interest when the debtor ultimately proved to be solvent"); *see generally* 3A Collier on Bankruptcy, ¶ 63.16[1] n. 10 (14th ed.1986) (collecting pre-Code cases which recognize the solvency exception)

As the foregoing discussion would suggest, the solvency exception is grounded in equity, rather than contract law. *See Ron Pair*, 489 U.S. at 248, 109 S.Ct. 1026 ("All the [pre-Code] exceptions to the denial of postpetition interest 'are not rigid doctrinal categories. Rather, they are flexible guidelines which have been developed by the courts in the exercise of their equitable powers in insolvency proceedings.'" (citation omitted)); *In re Colortex Indus., Inc.*, 19 F.3d 1371, 1376, 1380 (11th Cir.1994); *see generally Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165, 67 S.Ct. 237, 91 L.Ed. 162 (1946) ("[T]he touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."). But of course when a creditor had a contractual right to interest, the argument for invoking the exception was particularly compelling. *See Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir.1959) ("Undoubtedly the debtor filed its petition under Chapter XI because it believed it beneficial to itself to do so, and in a case such as this, where there is no showing that the creditor [contractually] entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act."); *In re*

---

**2.** At its inception, the Bankruptcy "Act was essentially a liquidation procedure as opposed to a procedure designed to rehabilitate a business debtor." 1 Collier on Bankruptcy, ¶ 1.01[1][a] (15th ed. rev.1999). Equity receiverships were incorporated into the Act in the 1930's. *See infra* n. 3 and accompanying text.

*International Hydro–Electric Sys.*, 101 F.Supp. 222, 224 (D.Mass.1951) ("[T]he stockholders [of a corporation which filed for rearrangement pursuant to the Public Utility Holding Company Act] ... cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provision of the trust indenture."). In fact, there is pre-Code authority supporting the view that application of the exception was obligatory under such circumstances. *See In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d 524, 528, 530–32 (7th Cir.1986); *cf.* 3A *Collier on Bankruptcy*, ¶ 63.16[1] (14th ed. 1986) ("[C]ases of ultimate solvency reflect what is truly the rule rather than the exception, namely that a debtor should pay interest up to *the day of payment*, a rule whose operation is merely suspended where a debtor is so hopelessly insolvent that he is unable to pay even the provable part of a claim, namely principal and interest accrued prior to bankruptcy." (footnote omitted)).

Returning to the present-day Code, it can readily be seen that § 502(b)(2) is nothing new, but rather is derived from— and closely analogous to— § 63. Indeed, the Code's legislative history indicates that the proposal to disallow claims for unmatured interest is consistent with "present law." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), at 353. Thus the enactment of § 502(b)(2) would not seem to be a repudiation of either the solvency exception in general, or the recognition of contract interest rates in particular. *See generally Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341, 348 (1998) ("We ... 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure' ...." (citation omitted)).

Nor does the text of § 502(b)(2) support the argument that the statute rules out postpetition, contract-rate interest. Underlying this argument is the implicit assumption that judicial recognition of the right to postpetition interest constitutes the "allowance" of a claim. But as will be seen, that assumption is at best only partly correct.

■ The Code expressly states that an oversecured creditor is "allowed" postpetition interest to the extent of the collateral's value. 11 U.S.C. § 506(b). Given the terminology of § 506(b), it may be that such a creditor holds an "allowed claim" for postpetition interest. *See Rake v. Wade*, 508 U.S. 464, 471, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) (Postpetition interest on an oversecured creditor's claim "accrues as part of the allowed claim from the petition date until the confirmation or effective date of the plan."); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 372–73, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (citing § 502(b)(2) as the source of "the general rule disallowing postpetition interest," and indicating that § 506(b) carves out an exception to that rule); *In re Harko*, 211 B.R. 116, 118–19 (2d Cir. BAP 1997), *aff'd*, 141 F.3d 420 (2d Cir.), *cert. denied*, 525 U.S. 872, 119 S.Ct. 169, 142 L.Ed.2d 138 (1998).

Now consider § 726(a)(5), which requires payment of postpetition "interest ... on any [allowed] claim" when there is more than enough money on hand to pay allowed claims in full. 11 U.S.C. § 726(a)(5). Like § 506(b), this statute has been described as creating an "exception" to § 502(b)(2). *See In re Kentucky Lumber Co.*, 860 F.2d 674, 676 (6th Cir. 1988). But unlike § 506(b), there is no provision in § 726(a)(5) for the "allowance" of postpetition interest. In fact, if such interest were viewed as comprising a part of the "allowed claim," the structure of § 726(a) would be nonsensical: The interest requirement under sub-paragraph (5) would kick in only after interest (as an allowed claim) had already been paid pursuant to sub-paragraphs (1) through (4).

Properly understood, then, interest under § 726(a)(5) is paid *on* an allowed claim (as stated in the statute itself), rather than *as* an allowed claim. And since § 502(b)(2) speaks only to claim *allowance*, there is no tension between that statute and § 726(a)(5). For the same reason, § 502(b)(2) does not rule out the possibility of interest *on* allowed claims pursuant to § 1129(b).

In short, pendency interest—whether based on § 726(a)(5) or § 1129(b)'s requirement that the plan be fair and equitable—does not constitute an allowed claim. Thus the proposition that such interest must be paid is compatible with § 502(b)(2).

## B. Section 726(a)(5)

This section provides for the payment of interest on allowed claims "at the legal rate from the date of the filing of the petition." 11 U.S.C. § 726(a)(5). Pursuant to § 726(a)(5), creditors of a solvent chapter 7 estate are entitled to postpetition interest at the rate applicable to federal judgments under 28 U.S.C. § 1961(a). *See Dow Corning,* 237 B.R. at 394.

Section 726(a)(5) represents a codification of the "solvency exception" discussed in subsection A. *See Colortex,* 19 F.3d at 1376. And since this statute calls for the application of a statutory interest rate, the Proponents reason, the Code has implicitly rejected the use of prepetition contracts in determining the appropriate rate of postpetition interest.

We acknowledge that the Proponents' construction of the Code promotes simplicity and cross-chapter parity, inasmuch as the same statutory interest rate would be paid to creditors in both liquidation and reorganization proceedings. *See Dow Corning,* 237 B.R. at 407 ("A uniform rate ... keeps the bankruptcy estate from being saddled with potentially difficult and time-consuming administrative burdens."). But there is a price to be paid for "simplicity," as a creditor's contract rights may at

least arguably be compromised by application of the federal judgment rate. Congress might rationally have decided that this trade-off was justifiable only in chapter 7 liquidations, which typically proceed fairly quickly in comparison to reorganization proceedings. *See id.* (" '[A] chief purpose of the bankruptcy laws is to secure a prompt and effectual administration ... of the ... estate....['] Congress viewed this policy to be of particular importance in the context of a chapter 7 case." (citations omitted)); *see also Coastal Prod. Credit Ass'n v. Oil Screw "Santee",* 51 B.R. 1018, 1020 (S.D.Ga.1985) ("In a simple Chapter 7 insolvency proceeding, ... the goal of the bankruptcy court is to achieve a rapid liquidation...."); *In re Mavrode,* 205 B.R. 716, 720 (Bankr.D.N.J.1997) ("In Chapter 7 proceedings, liquidation is to be accomplished as rapidly as possible...."); *In re Dowco Petroleum,* 137 B.R. 207, 213 (Bankr.E.D.Tex.1992) ("The entire framework and concept of the liquidation of an estate under Chapter 7 envisions a rapid marshalling of the assets, sale or abandonment thereof and distribution of the proceeds to the parties entitled thereto."); *cf. In re Great American Pyramid Joint Venture,* 144 B.R. 780, 794 n. 11 (Bankr. W.D.Tenn.1992) ("Experience has demonstrated that chapter 7 liquidations are generally much less ... time consuming than liquidations under chapter 11."). The Commercial Creditors' interpretation of the Code therefore cannot be dismissed as "absurd." *See generally, e.g., Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd[ ] has long been a judicial function.").

Moreover, the proposition that the federal judgment rate applies in all Code chapters cannot be reconciled with the central role of contract rights in a pending reorganization. To understand that role, one need only consider the concept and potential consequences of "impairment."

■ The Code provides that "a plan may ... impair or leave unimpaired any class of claims." 11 U.S.C. § 1123(b)(1). "Claims are unimpaired if they retain all of their *prepetition ... contractual rights* against the debtor." *Bank of American Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 442, 119 S.Ct. 1411, 1416, 143 L.Ed.2d 607, 615 n. 14 (1999) (emphasis added). *See* 11 U.S.C. § 1124. While creditors generally enjoy the right to "accept or reject a plan," 11 U.S.C. § 1126(a), a class which is unimpaired is "conclusively presumed to have accepted the plan." 11 U.S.C. § 1126(f). Impairment does not become effective until the plan is confirmed. *See* 11 U.S.C. § 1141(a) ("[T]he provisions of a *confirmed* plan bind the debtor ... and any creditor ..., whether or not the claim ... of such creditor ... is impaired under the plan and whether or not such creditor ... has accepted the plan." (emphasis added)).

Under this scheme, a chapter 11 creditor's contract rights provide the creditor with leverage in negotiating the terms of a reorganization plan. Since impairment is not mandatory, those rights may survive plan confirmation intact. And even if impairment of contract rights is proposed, it is not until confirmation that the rights can be said to have been extinguished. Thus it is clear that a creditor's contractual right to interest retains validity during the pendency of chapter 11 reorganization. *See* Vol. E, *Collier on Bankruptcy,* App. Pt. 9–87 (15th ed. rev.1999) (This treatise reprints legislative history which, in explaining that the purpose of a 1994 amendment to § 1124 was to prevent solvent debtors from depriving creditors of postpetition interest, favorably cites pre-Code cases supporting the view that postpetition interest is to be paid at the contract rate.).

If Congress had intended to supplant the contractual right to interest with the rate specified by 28 U.S.C. § 1961(a), one would expect that intention to be plainly expressed. But no such expression exists. Rather than being set forth in a statute of general applicability, the provision for "interest at the legal rate" is found in § 726(a)(5), which applies exclusively to chapter 7 proceedings. *See* 11 U.S.C. § 103(b).

■ Of course, § 726(a)(5) is made potentially relevant to chapter 11 by the "best-interests-of-creditors test," which requires that an impaired claim-holder who does not accept the proposed plan must "receive ... under the plan ... property of a value ... that is not less than the amount that such holder would ... receive ... if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7)(A)(ii). Application of this test in the case of a solvent chapter 11 estate means that the claim-holder is entitled to postpetition interest in accordance with 28 U.S.C. § 1961(a). *See Dow Corning,* 237 B.R. at 394.

■ But what must be remembered is that by its own terms, the best-interests test simply establishes a *minimum* payment requirement. *See* 11 U.S.C. § 1129(a)(7)(A)(ii) (The creditor must receive property of a value "*not less than* the amount" which would be received under chapter 7. (emphasis added)); *see also* C. Fortgang & L. King, *The 1978 Bankruptcy Code: Some Wrong Policy Decisions* ("*Some Wrong Policy Decisions*"), 56 N.Y.U.L.Rev. 1148, 1156 (1981) (Section 1129(a)(7)(A)(ii) "has the effect of bringing into play the distribution scheme set forth in section 726 as a *minimum* standard." (emphasis added)). Thus the upshot of the best-interests test is that the creditor of a solvent chapter 11 estate must receive postpetition interest at a rate which is *at least* equal to the federal statutory rate. We are unwilling to infer from this that Congress intended to preclude creditors from being paid at a higher rate.

In arguing against application of contractual interest rates, the Proponents rely on our recent decision in *Dow Corning,* where we observed:

A chapter 7 bankruptcy ... estate's value will generally be fixed at the time of the filing. Similarly, each unsecured creditor's claims is valued as of the petition date.... The length of time between the petition date and the date that creditors receive payment depends upon how quickly the bankruptcy estate can be administered. The delay in payment, therefore, results almost entirely from the procedural mechanisms of the bankruptcy laws.... Any post-petition interest that a chapter 7 estate is required to pay pursuant to § 726(a)(5) likewise accrues because of the delay caused by the administration of federal bankruptcy law.... The purpose of post-petition interest, then, is to compensate a successful creditor for any delay that occurs between the time of entitlement (the petition date) and the time of payment.

...

*[P]ost-petition interest does not serve to continue the contractual rights which formed the basis of the underlying claim. Rather,* just as with post-judgment interest, *it serves to compensate the successful party for any delay that occurs between the time of entitlement and the time of payment.*

*Dow Corning,* 237 B.R. at 405, 409 (emphasis added). Citing the highlighted comments, the Proponents assert that the use of contractual interest rates "would be inconsistent with the purpose of awarding postpetition interest under the Code." *Proponents' Brief* at 13.

We reject this assertion. Our comments in the previous opinion were made with reference to chapter 7 liquidations generally, and § 726(a)(5) in particular. In that context, contractual rights are irrelevant. *See Dow Corning,* 237 B.R. at 409.

It does not necessarily follow, however, that contract rights are *never* relevant. *See id.* at 391 n. 6 (suggesting that we might reach a different result were we not required "to analyze the ... issue as though the Debtor were in chapter 7"). And for the reasons explained *supra* pp.

685–86, such rights are in fact of pivotal importance in the chapter 11 plan-confirmation process.

So while claim allowance may be tantamount to entry of a "judgment," *see Dow Corning,* 237 B.R. at 391–92, a chapter 11 creditor's contract rights are not merged into that judgment. *Cf. In re Realty Assocs. Sec. Corp.,* 163 F.2d 387, 390 (2d Cir.1947) ("[W]e are not convinced that the 'judgment theory' is applicable in a Chapter X reorganization, where the very purpose of the proceeding is to keep the debts in statu[s] quo until a plan can be adopted.... It is, of course, necessary to liquidate the debts, but the proposal is not that they will be paid at maturity but that they will be extended in whole or in part by means of substituted obligations...."); *see generally, e.g., Grappo v. Alitalia Linee Aeree Italiane,* 56 F.3d 427, 432 (2d Cir.1995) ("[U]nder elementary res judicata principles, plaintiff's contract claims would merge in this $5,000 judgment, and he would be barred from recovering the balance."). A plan proponent must therefore reckon with those contract rights. And if a cramdown is attempted, the proponent must also reckon with the requirement that the plan's payment provision be "fair and equitable." 11 U.S.C. § 1129(b)(1). In these respects, the chapter 11 claimant differs fundamentally from both its chapter 7 counterpart and a federal-judgment creditor. Thus there is no contradiction between the holding in our previous decision and the contention that § 1129(b) may mandate recognition of contractual interest rates.

**C. Section 1129(b)**

As explained at the outset, the Plan cannot be confirmed unless it is "fair and equitable" to Class 4. 11 U.S.C. § 1129(b). According to the Proponents, the contract interest rate is not an appropriate consideration when determining whether this standard is met. We will address that argument after outlining the origins of the fairness requirement.

The term "fair and equitable" has roots extending back to the 1800s, when "[t]he primary vehicle for [railroad] reorganization was the equity receivership." B. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations* ("*Owners, Auctions, and Absolute Priority* "), 44 Stan. L.Rev. 69, 75 (1991). In these reorganizations, which entailed a foreclosure and judicial sale of the railroad's encumbered assets to a newly formed entity, unsecured creditors frequently received little or nothing on their claims, notwithstanding the fact that shareholders of the "old" railroad obtained an ownership interest in the new one. *See id.* at 75–77.

Junior creditors who were squeezed out in this fashion challenged the validity of the judicial sale based on fraudulent conveyance law. *Id.* at 76. "Although the Supreme Court recognized the ... legitimacy of [such challenges] ... as early as 1868, bondholders and stockholders continued to ignore the rights of unsecured creditors by adopting reorganization plans that excluded these creditors." *Id.* at 78 (footnote omitted). In the wake of *Northern Pac. Ry. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), however, "reorganizations would never be the same." Markell, *Owners, Auctions and Absolute Priority*, 44 Stan. L.Rev. at 78.

Boyd, an unsecured creditor of the "old" railroad, sued the "new" entity "seeking to subject the property bought [by the new railroad at a foreclosure sale] to the payment of" the debt owed to him. *Boyd*, 228 U.S. at 501, 33 S.Ct. 554. He alleged "that the foreclosure sale was void because made in pursuance of an illegal plan of reorganization, between bondholders and stockholders of the [old] railroad, in which, though no provision was made for the payment of unsecured creditors, the stockholders retained their interest by receiving an equal number of shares in the new" railroad. *Id.*

The Court stated as a general proposition that "a transfer by stockholders from themselves to themselves cannot defeat the claim of a non-assenting creditor." *Id.* at 502, 33 S.Ct. 554. Such a transfer was "void in equity" as to the creditor. *Id.* For pragmatic reasons, however, an exception is made in the context of a "reorganization" accomplished by means of "a foreclosure sale." *Id.* at 503–04, 33 S.Ct. 554. Such a sale could "bind creditors who do not accept *fair terms* offered." *Id.* (emphasis added). *See also id.* at 508, 33 S.Ct. 554 ("If [the creditor] ... declines a fair offer he ... could not thereafter be heard in a court of equity to attack [the reorganization].... If, however, no such tender was made and kept good he retains the right to subject the interest of the old stockholders in the property to the payment of his debt.").

*Boyd*'s "fair-offer" requirement found its way into the Bankruptcy Act. "[I]n 1933 and 1934, Congress ... [created] Sections 77 and 77B[,] ... each [of which] required judicial findings that proposed plans be 'fair and equitable' before a plan could be confirmed."[3] Markell, *Owners, Auctions, and Absolute Priority*, 44 Stan. L.Rev. at 83; *see Case v. Los Angeles Lumber Prods.*, 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939) ("The words 'fair and equitable' as used in § 77B(f) are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial

---

**3.** Sections 77 and 77B applied, respectively, to railroad and general corporate reorganizations. *United States v. Key*, 397 U.S. 322, 329–31, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970). Section 77B was replaced with Chapter X, which also required "that any reorganization plan be 'fair and equitable.' " *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 444, 119 S.Ct. 1411, 1416–17, 143 L.Ed.2d 607, 616–17 (1999). The law of "federal [e]quity receiverships" served as "the source of" these statutory proceedings, *In re Stirling Homex Corp.*, 591 F.2d 148, 155 (2d Cir.1978), and courts presiding over such proceedings continued to exercise broad equitable powers. *See Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165 n. 8, 67 S.Ct. 237, 91 L.Ed. 162 and accompanying text (1946).

interpretations in the field of equity receivership reorganizations." (citing *Boyd* and other "familiar cases")).

As this brief recitation would suggest, a major purpose of the fairness requirement was to ensure that the proposed reorganization respected the rights of different classes of creditors, both *inter sese* and, especially, vis-à-vis the rights of the corporate debtor's shareholders. *See Case,* 308 U.S. at 115–16, 60 S.Ct. 1. This principle, which became known as the "rule of ... absolute priority," *id.* at 117, 60 S.Ct. 1, "requires that creditors of a debtor ... receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests ... may share in the assets of the reorganized entity." *In re Trevarrow Lanes, Inc.,* 183 B.R. 475, 489 (Bankr.E.D.Mich.1995) (quoting D. Powlen & A. Wuhrman, *The New Value Exception to the Absolute Priority Rule: Is Ahlers the Beginning of the End?,* 93 Comm. L.J. 303, 303 (1988)).

In *Consolidated Rock Prods. Co. v. Du-Bois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941), the Supreme Court invoked this rule on behalf of creditors asserting a right to postpetition interest at the contract rate. The plan under consideration in that § 77B reorganization case called for the debtor entities—a parent corporation and its two wholly owned subsidiaries—to transfer their assets to a newly formed corporation. *Id.* at 514–15, 61 S.Ct. 675. Holders of the subsidiaries' outstanding bonds would be required to surrender them in exchange for bonds and stock issued by the new company. *Id.* at 515–16, 61 S.Ct. 675. Stock in the new company was also to be issued to the parent company's shareholders. *Id.* at 516, 61 S.Ct. 675.

The Court was asked to assess "the fairness ... of [the] ... plan." *Id.* at 514, 61 S.Ct. 675. It was decidedly unimpressed:

The instant plan runs afoul of [the absolute priority rule].... [T]he bondhold-

ers for the principal amount of their 6% bonds receive an equal face amount of new 5% income bonds and preferred stock, while the preferred stockholders receive new common stock. True, the relative priorities are maintained. But *the bondholders have not been made whole.* They have received an inferior grade of securities, *inferior in the sense that the interest rate has been reduced,* a contingent return has been substituted for a fixed one, the maturities have been in part extended and in part eliminated by the substitution of preferred stock, and their former strategic position has been weakened. Those lost rights are of value. *Full compensatory provision must be made for the entire bundle of rights which the creditors surrender.*

...

"No offer is fair which does not recognize the prior rights of creditors...." ... [W]hile creditors may be given inferior grades of securities, their "superior rights" must be recognized. Clearly, those prior rights are not recognized, in cases where stockholders are participating in the plan, if creditors are given only a face amount of inferior securities equal to the face amount of their claims. They must receive, in addition, compensation for the senior rights which they are to surrender. If they receive less than that *full compensatory treatment,* some of their property rights will be appropriated for the benefit of stockholders without compensation.

...

So long as [creditors] ... receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of "fair and equitable" are satisfied.

*Id.* at 527–30, 61 S.Ct. 675 (citation omitted; emphasis added).

Thus *DuBois* makes clear that under pre-Code law, the "fair and equitable" standard precluded shareholders of a sol-

vent debtor from retaining ownership unless they recognized, or "fully compensated for," a creditor's right to interest at the contract rate. *See also Debentureholders Protective Comm. of Continental Inv. Corp. v. Continental Inv. Corp.*, 679 F.2d 264, 270 (1st Cir.1982) (A solvent-debtor chapter X case in which the court ruled that the plan was "unfair and inequitable because [it] ... does not provide in exchange for the creditor's contractual right [to compound interest] just compensation."); *In re Lexington Homes*, 94 F.Supp. 482, 484 (D.N.J.1950) ("[T]he 'absolute priority rule' demands that the creditors of each class receive full compensatory treatment for the entire bundle of rights they surrender. Interest on a claim is one of such rights.... '[A]s a general rule, interest on all claims, whether fixed by contract or by the applicable local law, accrues until the date of the consummation of the plan and must be accorded the same priority as the principal of the claim.'") (quoting 6 Collier on Bankruptcy, p. 2815 *et seq.* (14th ed.)); Fortgang & King, *Some Wrong Policy Decisions*, 56 N.Y.U. L.Rev. at 1158–59 ("[U]nder the Bankruptcy Act, ... [f]ull payment [for purposes of the 'fair and equitable' requirement] ... meant that the senior classes must have been offered consideration under the plan in an amount equal to their entire bundle of rights, including ... postpetition interest through the date of payment at the full, contractually agreed-upon rate."). It therefore follows that the right to interest at the applicable contract rate was a legitimate consideration under pre-Code law when assessing whether a plan was "fair and equitable."

Since § 1129(b) continues to use the phrase "fair and equitable," it would seem that the contract interest rate would likewise continue to be of relevance. *See generally Lorillard v. Pons*, 434 U.S. 575, 583, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("[W]here words are employed in a statute

which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary." (citation omitted)). But with the advent of the Bankruptcy Code, the Proponents assert, the issue of contract interest rates is now off limits. In the two sub-parts which follow, we address the arguments made in support of that assertion.

### (i.) Adding a Statutory Requirement

The Proponents make much of the fact that the Code sets forth specific requirements relating to the "fair and equitable" standard, with no mention of postpetition interest. Section 1129(b)(2) reads:

[T]he condition that a plan be fair and equitable with respect to a class *includes* the following requirements:

. . .

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B)(emphasis added).

■■■■ Congress explicitly provided that references in the Code to the term "includes" are not to be construed as "limiting." 11 U.S.C. § 102(3). Since that term is used in § 1129(b)(2)(B)'s preamble, it is clear that the statute's list of "requirements" is non-exhaustive.[4] *See Trevarrow*

---

4. The Proponents advise us that "Representative Edwards and Senator DeConcini each told his respective house that, under [pro-

posed] § 1129(b)(2)(B)(i), 'the court *must confirm* the plan notwithstanding the dissent of a class of impaired unsecured claims if the plan

*Lanes,* 183 B.R. at 492 (collecting cases). Accordingly, the fact that a requirement is not listed would generally be of negligible significance.

The Proponents, however, claim that this particular omission is telling because there are "express postpetition interest provisions elsewhere in the Code"—namely, §§ 506(b) and 726(a)(5). *Proponents' Brief* at 10. The existence of these provisions, they assert, is an "indicat[ion] that the absence of any reference to postpetition interest in § 1129(b)(2)(B)(i) is no accident, but rather a deliberate policy decision by the drafters of the Code." *Id.* To buttress this assertion, the Proponents cite a rule of statutory construction which has it that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (quoting *Gozlon–Peretz v. United States,* 498 U.S. 395, 404, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991)).

As the foregoing quote indicates, this "disparate-inclusion" rule is only a *general* rule. And it is one which carries little weight. *See Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351, 360 (1995) ("Without more, the inference [arising under the rule] might be a helpful one. But there is more here, showing why the negative pregnant argument should not be elevated to the level of interpretive trump card."). In this case, the rule's "presumption" is weaker still because the "disparate exclusion" is from a list which is by its own terms non-exhaustive, and the "disparate inclusion" is in provisions that differ markedly from § 1129(b) in wording and general purpose. *See United States v. Grander-*

*son,* 511 U.S. 39, 63, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (Kennedy, J., concurring) ("The presumption [created by the rule] loses some of its force when the sections in question are dissimilar and scattered at distant points of a lengthy and complex enactment."); *cf. Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of California,* 153 F.3d 938, 945 (1998) ("Because the regulation expressly provides that the list is not exhaustive, it cannot be read pursuant to the principle expressio unius est exclusio alterius.").

Even if Congress deliberately omitted "interest at the contract rate" in drafting § 1129(b)(2)(B), it does not necessarily follow that the contract rate can *never* be imposed as a requirement. To the contrary, an intentional omission on the part of Congress, coupled with the fact that the Code does not affirmatively preclude consideration of contract rights, would suggest that the drafters chose to take the middle ground—neither categorically requiring nor prohibiting recognition of contract interest rates.

That Congress would refrain from imposing a hard-and-fast rule makes a good deal of sense, as the payment of postpetition interest does not necessarily come solely at the shareholders' expense. In some cases, such payments may mean a *pro tanto* reduction in the payment of *principal* owed to lower-priority creditors. And pre-Code cases were not unanimous in requiring the payment of postpetition interest under such circumstances. *See Vanston,* 329 U.S. at 166, 67 S.Ct. 237 (The payment of compound interest to senior creditors, though required by contract, was inequitable and thus not permissible in bankruptcy because it would mean that "subordinate creditors would have [to] suf-

provides for such claims to receive property with a present value equal to the allowed amount of the claims.' " *Proponents' Brief* at 8 (citations omitted; emphasis added by the Proponents). That proposition, of course, cannot be reconciled with the text of § 1129(b)(2), and if accepted would in effect mean that the statutory requirements *are* ex-

haustive. We therefore disregard this snippet of legislative history, which even the Proponents implicitly concede is insignificant. *See id.* at 7 ("[Section] 1129(b)(2) 'leaves the door open for *more* requirements.)' ... [A] court may add *other* requirements not already covered by the statute itself." (citation omitted; emphasis added by the Proponents).

fer[ ] a corresponding loss."); *see general-ly* K. Klee, *Valuation and Cram Down,* SB37 ALI–ABA 455, 462–63 (1997) ("[U]nder Chapter X of the Bankruptcy Act, courts *sometimes* construed the fair and equitable rule to require the payment, under a properly drafted contract, of postpetition interest to a senior class before junior classes or shareholders were entitled to participate.") (emphasis added; footnotes deleted); *id.* at 463 n. 47 (referring to "cases in which three courts of appeals recognized the [fair-and-equitable] rule but refused to find the agreement having the requisite specificity to subordinate junior principal to postpetition interest in a bankruptcy case, and one district court denied payment of postpetition interest entirely"). Given the case-specific nature of the fairness inquiry, then, it may well be that postpetition contractual interest is a matter which the Code leaves to the discretion of the courts. *Cf. In re Spanish Lake Assocs.,* 92 B.R. 875, 878 (Bankr.E.D.Mo. 1988) ("Freddie Mac argues that negative amortization of ... post-confirmation interest never satisfies the 'fair and equitable' standards of § 1129(b)(2)(A)(i)(II).... This Court, however, is reluctant to place a blanket prohibition on negative amortization and believes the issue should be resolved on a case-by-case basis. Such flexibility was legislated into the Code by the very fact that terms such as 'fair and equitable' resist precise definition.").

For these reasons, we are unpersuaded that payment of pendency interest at the contract rate is an impermissible "addition" to the requirements listed in § 1129(b)(2)(B).

#### (ii.) Changing a Statutory Requirement

As we have seen, § 1129(b)(2) states that with respect to a dissenting class of unsecured claims, "the condition that a plan be fair and equitable ... includes the ... requirement[ ] ... that each [claim] holder ... receive [pursuant to the plan] ... property of a value, as of the effective date of the plan, equal to the allowed amount of [its] ... claim." 11 U.S.C. § 1129(b)(2)(B)(i). The Proponents assert that since the Plan would pay Class 4 the amount required by this provision, we are foreclosed from considering whether the class ought to receive more than that amount.

In support of this assertion, the Proponents make the following argument:

It is true that the word "includes" in § 1129(b)(2) "leaves the door open for *more* 'requirements.'" ... It does not, however, permit courts to *alter* the existing "requirements" that Congress specified in the statute. Although "includes" is "not [a] limiting" term, ... its direct object in § 1129(b)(2) is "requirements." The plain meaning of non-exclusively "includ[ing]" specified "requirements" is that a court may impose *additional* "requirements." But this does not provide courts with the authority to *change* the "requirements" explicitly adopted by Congress; otherwise they wouldn't be requirements. Suppose a federal statute ... provided that the qualifications for President of the United States "include the requirement that he or she be at least 35 years old." This could not possibly mean that a 30-year-old is eligible just because the word "includes" is "not limiting." Nor would a court, in the guise of adding to the statute's "minimum requirements" ..., have the power to rule that candidates must be at least 40 to be on the ballot. The same is true for § 1129(b)(2). The "requirements" actually listed in that section cannot be modified, although a court may add *other* requirements not already covered by the statute itself.

*Proponents' Brief* at 7 (citations omitted; emphasis added by the Proponents).

The clear implication of the Proponents' hypothetical statute is that persons younger than 35 are not sufficiently mature to serve as President, and that age alone is not an appropriate ground for disqualify-

ing a person who is at least 35. Faced with such a statute, we agree with the Proponents that a strong argument could be made against imposing an age requirement other than 35. Such an argument is compelling because a requirement that candidates be no less than 30 (or 40) years of age is logically inconsistent with the hypothetical statute. The same cannot be said, however, with respect to the issue with which we are faced.

Pendency interest either is or is not a part of "allowed claims" to be paid pursuant to § 1129(b)(2)(B)(i). If it is, then of course there is no question here of "changing" the requirements of that statute: The parties simply disagree as to the amount of the allowed claims.

■ If "allowed claim" excludes pendency interest—as we believe to be the case, see supra p. 685, then such interest is not governed by § 1129(b)(2)(B)(i). It is instead something which must be paid *in addition to* the allowed claim. Thus there is no contradiction between the assertion that allowed claims of the dissenting class must be fully paid (as per § 1129(b)(2)(B)(i)), on the one hand, and the assertion that as a matter of fairness, the holders of such claims are also entitled to pendency interest at the contract rate.[5]

## D. Legislative History

The Proponents cite remarks in the Code's legislative history indicating that Congress viewed § 1129(b) as "new" and only a "partial codification" of the absolute priority rule. See *id.* at 4. They also point to the lack of any affirmative indication in such history that Congress "intended to adopt prior case law." *Id.*

With regard to the "newness" remark, we note that there are a couple of obvious differences between § 1129(b) and its pre-Code analogues. Under § 1129(b), a finding that a plan is "fair and equitable" is required only in the context of a cram-down: Previously, such a finding was mandated in connection with both preliminary plan approval *and* confirmation in *all* chapter X cases. See Fortgang & King, *Some Wrong Policy Decisions,* 56 N.Y.U. L.Rev. at 1157–58. And "section 1129(b) . . . , unlike former chapter X, sets forth specific guidelines for the determination of fairness and equitability [sic]." *Id.* at 1157. The comment in the legislative history describing § 1129(b) as "new" may therefore be nothing more than a recognition of these readily observable changes. Or, as asserted by the Commercial Creditors, it may simply have drawn attention to the fact that a House–Senate compromise bill "differed from the House bill." *Reply Memorandum of Official Committee of Unsecured Creditors* at 8.

The other legislative comment which the Proponents highlight describes § 1129(b)(2)(B) as a "partial codification of the absolute priority rule." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), at 414. The Proponents apparently view this comment as evidence that Congress chose to reject applications of the rule which were *not* "codified." And since contract-rate interest is one such application, see *supra* pp. 689–90, the argument goes, it is no longer a requirement under the "fair and equitable" standard.

There are two problems with this argument. First, the fact that the contract-interest requirement was not incorporated into the codified version of the absolute priority rule does not warrant the infer-

5. When allowed claims are paid over time, the dissenting class is of course entitled to post-confirmation interest. See, e.g., Rake v. Wade, 508 U.S. 464, 472 n. 8, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). But such interest is set by prevailing market conditions, rather than by the parties' pre-petition contract. See, e.g., General Motors Acceptance Corp. v. Jones, 999 F.2d 63, 67–70 (3d Cir.1993); In re Bellamy, 962 F.2d 176, 185–86 (2d Cir.1992), overruled on other grounds by Nobelman v. American Sav. Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); United States v. Arnold, 878 F.2d 925, 929–30 (6th Cir. 1989).

ence that Congress rejected it: As indicated earlier, the lack of an explicit statutory rejection of such a requirement suggests that it *may* be imposed depending on the circumstances.

Second, there is more to "fairness" than the absolute priority rule. That was true under pre-Code law. *See Case*, 308 U.S. at 115, 60 S.Ct. 1 ("In equity reorganization law the term 'fair and equitable' included, *inter alia*, the [absolute priority rule] ...."): Markell, *Owners, Auctions, and Absolute Priority*, 44 Stan. L.Rev. at 71–72 (describing the absolute priority rule as only one of "many factors," albeit a "famous" one, taken into consideration when determining whether a plan is "fair and equitable"). And it is no less true today, as demonstrated by the fact that the list of requirements under §. 1129(b)(2) is not exhaustive. *See supra* p. 690; *see also, e.g., In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir.1985) (" '[F]air and equitable' ... means, *among other things*, that the plan must assure [that] each creditor's claim is given appropriate priority." (emphasis added)). Thus even if the matter of contract interest cannot properly be categorized as an "absolute priority" issue, it still fits within the more general "fair and equitable" rubric.

Lastly, we see virtually no probative value in the apparent absence of a statement in the legislative history expressing a desire to adopt pre-Code law. The Proponents are arguing in effect that with the advent of the Code, Congress intended to repudiate prior law and preclude courts from considering whether fairness requires payment of interest at the contract rate. We can infer such intent only if is plainly expressed. *See De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d at 348 (quoted *supra* p. 684). The evidence upon which the Proponents rely falls well short of that lofty standard.

### E. Equity May Require Payment of Contract Interest

In the preceding subsections we explained why the Proponents' argument for a narrow construction of § 1129(b) are unconvincing. The prevailing and better view is that the phrase "fair and equitable" is as broad as it sounds. *See, e.g., In re D & F Constr. Inc.*, 865 F.2d 673, 675 (5th Cir.1989) (The fair-and-equitable standard requires "consider[ation of] the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances."); *In re Rudd*, No. 94–0751, 1995 WL 314493, at *4 (D.D.C. Apr. 12, 1995) ("The Court is entitled to consider whether the plan is fair and equitable in a broad sense."); *In re Salem Suede, Inc.*, 219 B.R. 922, 934 (Bankr.D.Mass.1998) (favorably citing *D & F* ); *In re Sunflower Racing, Inc.*, 219 B.R. 587, 604 (Bankr. D.Kan.), *aff'd*, 226 B.R. 673 (D.Kan.1998) (same); *In re Horwitz*, 167 B.R. 237, 241 (Bankr.W.D.Okla.1994) (Section 1129(b) places "the decision for or against confirmation ... squarely within the discretion of the judges and encompasses all their intrinsic perceptions of fairness and equity."); *In re Manion*, 127 B.R. 887, 890 (Bankr.N.D.Fla.1991) (favorably citing *D & F* ); *see also In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 486 (Bankr. S.D.Ohio 1994) (enumerating seven "relevant factors to consider in determining whether a plan is generally fair and equitable"); *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr.W.D.Tenn.1991) (listing ten factors to consider "in evaluating whether this plan provides fair and equitable treatment"); *Spanish Lake*, 92 B.R. at 878 (listing five "elements" pertinent to the question of whether a provision calling for "negative amortization of ... post-confirmation interest" is "fair and equitable"); *cf. In re Rocky Mountain Refractories*, 208 B.R. 709, 718 n. 6 (10th Cir.BAP1997) (Bohanon, J., dissenting) (suggesting that, while there appeared to be no "required priority" in the Code for interest on taxes, such priority could be mandated by § 1129(b)(1)); *In re Martindale*, 125 B.R. 32, 40 (Bankr.D.Idaho 1991) ("While carving up the farm may benefit Debtors by

allowing an immediate sale of the small parcel, to be 'fair and equitable' such decision must also take into consideration any difficulties created in selling the remaining parcels.").

█ This circuit, moreover, has reaffirmed *Vanston's* pre-Code maxim "that the touchstone of each decision on allowance of interest in bankruptcy ... and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." *Kentucky Lumber,* 860 F.2d at 677 (quoting *Vanston,* 329 U.S. at 165, 67 S.Ct. 237). *See also In re Anderson,* 833 F.2d 834, 836 (9th Cir.1987) (per curiam) ("[A]n award of post-petition interest is governed generally by the equities of the case...."). The wide parameters associated with the fairness inquiry, in conjunction with the discretion which we are generally accorded in matters concerning post-petition interest, lead us to conclude that a plan which would pay the dissenting class pendency interest at the minimum rate pursuant to §§ 1129(a)(7)(ii)/726(a)(5) is not necessarily "fair and equitable" for purposes of § 1129(b).

## II.

█ We must next decide whether the Plan is in fact "fair and equitable." The Proponents bore the burden of proof with respect to this point. *See, e.g., In re Sagewood Manor Assocs. Ltd. Partnership,* 223 B.R. 756, 767 (Bankr.D.Nev.1998) ("[T]he debtor may seek confirmation of the plan by demonstrating that the plan is 'fair and equitable' ...."); *In re Economy Lodging Sys., Inc.,* 205 B.R. 862, 865 (Bankr. N.D.Ohio 1997) ("The Debtors have the burden of proving that the Plan does not violate th[e] absolute priority rule."); *Trevarrow Lanes,* 183 B.R. at 496; *In re Miami Center Assocs., Ltd.,* 144 B.R. 937, 943 (Bankr.S.D.Fla.1992).

█ In this context, the rationale for use of the contract rate of interest is straightforward: A debtor with the finan-cial wherewithal to honor its contractual commitments should be required to do so. The First Circuit unequivocally endorsed this reasoning:

> Where the debtor is *solvent,* the bankruptcy rule is that where there is a *contractual* provision, valid under state law, providing for interest on unpaid installments of interest, the bankruptcy court will enforce the contractual provision with respect to both instalments due before and ... after the petition was filed.... This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to *his* advantage. Moreover, the rule does not in any way affect any creditor other than the claimant of interest on interest.

*Continental Inv. Corp.,* 679 F.2d at 269. Similarly, the Seventh Circuit asserted that "[t]he only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *Chicago, Milwaukee, St. Paul & Pac. Ry.,* 791 F.2d at 527. *See also Ruskin,* 269 F.2d at 832 (quoted *supra* p. 683).

The Proponents made only a half-hearted effort to persuade the Court that use of the statutory interest rate is fair. They directed the Court's attention to our prior decision, in which we stated in dictum that "the payment of post-petition interest at the federal judgment rate does not provide a windfall to debtors and its use cannot be seen as ... inequitable to unsecured creditors." *Dow Corning,* 237 B.R. at 409. *See Proponents' Brief* at 1. This statement, however, was premised on the view that a *chapter 7* creditor's pre-petition contractual rights are essentially replaced by, or merged into, the allowed claim. *See Dow Corning,* 237 B.R. at 391–92, 405, 409.

That is not the case with respect to a chapter 11 claim. *See supra* pp. 686–87.

According to the Proponents, "the vast majority of the objecting commercial creditors purchased their claims—undoubtedly at a discount—*after* Dow Corning filed its Chapter 11 petition." *Proponents' Brief* at 12 n. 7. Because "[t]hese speculative institutional investors were well aware of the risks that bankruptcy posed to their newly-purchased investments," the Proponents argue, "they can hardly claim ... that they are somehow being treated unfairly." *Id.*

There is no contention, however, that these "institutional investors" acquired their claims improperly. We therefore see no reason to assess fairness differently as to them: If the "original" claim holders would have a right under § 1129(b) to interest at the contract rate, then so do the parties who purchased those claims. *See Chicago, Milwaukee, St. Paul & Pac. Ry.*, 791 F.2d at 527.

Put simply, the Proponents offered no persuasive reason for paying less than the contract rate of interest to Class 4 creditors. We therefore conclude that the Plan provision fixing the pendency interest rate at that which applies to federal judgments is not "fair and equitable."

Anticipating that eventuality, the Proponents "agreed that the [P]lan will pay whatever [rate of interest] we have to pay once the Courts have determined" the rate which is appropriate. *Transcript*, June 28, 1999 at 31. (Opening Statement of Debtor's Counsel). In light of this representation, the Commercial Creditors' objection—though sustained—does not establish grounds for denying confirmation. Rather, the Court deems the Plan to have been verbally amended to provide that pendency interest will be paid to Class 4 creditors in accordance with the terms of the parties' contracts. In determining the applicable rate, however, no effect is to be given to contractual provisions which purport to define as a default the filing of a voluntary petition for bankruptcy relief.

*Cf., e.g.,* 11 U.S.C. §§ 363(*l*), 365(b)(2), 365(e)(1)(B) and 541(c)(1)(B) (stating in various contexts that such a provision is unenforceable); *see generally In re James Cable Partners, L.P.,* 154 B.R. 813, 816 (M.D.Ga.1993), *aff'd,* 27 F.3d 534 (11th Cir. 1994) (referring to "a basic bankruptcy policy that abhors the operation of so-called 'ipso facto' clauses[,] ... which trigger a default ... upon the happenstance of bankruptcy" (citation omitted)); *In re Chedick,* No. 95–01096, 1996 WL 762329, at *3 (Bankr.D.C. Mar. 22, 1996) ("The 5% fee due when a bankruptcy petition is filed is void as a matter of public policy."); *In re Hutchins,* 99 B.R. 56, 57 (Bankr.D.Colo. 1989) ("Bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code."); *In re Perry,* 25 B.R. 817, 820 (Bankr.D.Md.1982) (en banc; per curiam) (Enforcement of "bankruptcy clauses ... would result in forfeitures contrary to the spirit of the Code, a result which courts of equity strain to avoid.").

Subject to the foregoing amendment, an order confirming the Plan has been entered.